## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **Orexigen Therapeutics, Inc.,** | Case No. 18-10518 (___) |
| Debtor.[1] | |

## DECLARATION OF MICHAEL A. NARACHI
## IN SUPPORT OF FIRST DAY RELIEF

I, Michael A. Narachi, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I have served as the President and Chief Executive Officer of Orexigen Therapeutics, Inc. (the "<u>Debtor</u>" or "<u>Orexigen</u>") since March 31, 2009.  In this capacity, I have become familiar with the Debtor's day-to-day operations, business, and financial affairs.

2.      On the date hereof (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") thereby commencing the above captioned case (the "<u>Chapter 11 Case</u>") and filed the motions described herein requesting certain relief (the "<u>First Day Pleadings</u>").  I submit this declaration (the "<u>Declaration</u>") on behalf of the Debtor in support of the Debtor's chapter 11 petition and the First Day Pleadings.

3.      The Debtor is operating its business and managing its property as debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA, 92037.

4.      The First Day Pleadings seek, among other things, to ensure the continuation of the Debtor's cash management system and other business operations without interruption and establish certain other administrative procedures to promote a smooth transition into the Chapter 11 Case.

5.      Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management or professionals, information learned from my review of the relevant documents, or my experience and knowledge of the Debtor's operations and financial condition and the biotech and pharmaceutical industry generally.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

6.      This Declaration is divided into three parts. Part I provides background information about the Debtor, its business operations, its corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Case. Part II summarizes the DIP Facility (as defined below) and sets forth the relevant facts in support of the DIP Motion. Part III sets forth the relevant facts in support of each of the First Day Pleadings.

## I.      BACKGROUND

### A.      The Debtor's Formation

7.      Orexigen was incorporated on September 12, 2002 under the laws of the State of Delaware and commenced operations in 2003. Orexigen wholly owns non-debtor Orexigen Therapeutics Ireland, Limited ("Orexigen Ireland"), which in turn wholly owns non-debtor Orexigen Therapeutics Ireland, LLC ("Orexigen LLC"). Orexigen Ireland was formed as a limited company on June 25, 2013 under the laws of the Republic of Ireland.  Orexigen LLC

was formed as a limited liability company on October 13, 2015 under the laws of the State of Delaware.

**B.      The Debtor's Business**

8.      Orexigen is a biopharmaceutical company focused on the treatment of obesity. Its sole commercial product, Contrave® (naltrexone HCL/bupropion HCL), is approved in the United States by the U.S. Food and Drug Administration ("FDA"), as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adults with an initial body mass index of 30 kg/m 2 or greater (obese), or 27 kg/m 2 or greater (overweight) in the presence of at least one weight-related co-morbid condition. The American Medical Association designated obesity as a disease in 2013. In 2016 the CDC reported that 36.5% of adults (approx. 91 million) suffered from obesity. Obesity is a chronic, relapsing and complex condition requiring ongoing management in order to maintain weight-loss.  Contrave® is a unique and proprietary combination of two generic drug components, each of which has already received regulatory approval for other indications and has been commercialized in the United States and in a majority of the member countries of the European Union. The drug was approved by the FDA in 2014 and is the only approved medicine for chronic weight management that is believed to work on two areas of the brain—the hypothalamus to reduce hunger and the mesolimbic reward system to help control cravings. The drug is the number one prescribed weight-loss brand in the United States with over 2.3 million prescriptions written to date which equates to approximately 800,000 patients.  In Europe, the drug has been approved under the brand name Mysimba™ (naltrexone HCl/ bupropion HCl prolonged release). The drug is also approved in South Korea, Canada, Lebanon and the United Arab Emirates.

9.     Orexigen's primary activities since incorporation include recruiting personnel, conducting research and development, including four Phase 3 clinical studies prior to FDA approval and ongoing post-marketing required studies, raising capital, overseeing the manufacturing, marketing and commercialization of its drug product in the United States, and establishing and supporting partnerships to commercialize the drug outside of the United States. The drug was originally launched in the United States by Orexigen's former partner, Takeda Pharmaceutical Company Limited ("Takeda"), in 2014.  In March 2016, Orexigen repurchased the commercial rights to the drug in the United States and in August 2016 became solely responsible for commercializing Contrave® within the United States. Outside of the United States, Orexigen has been commercializing the drug through a network of distribution partners since 2015 and the drug has been launched in 24 countries.

10.     Orexigen has experienced losses since its inception, and as of September 30, 2017, had an accumulated deficit of $765.6 million, primarily due to the cost of product clinical development. Orexigen continues to incur losses, and its ability to successfully transition to profitably is dependent upon achieving a level of revenues adequate to support Orexigen's cost structure and/or reducing Orexigen's cost structure. Orexigen projects it could be profitable by 2019 under its existing operating model and based on its current revenue forecasts. A successful patent litigation involving a challenge by a generic manufacturer was recently held in U.S. District Court of Delaware and confirmed exclusivity for Contrave® in the United States until 2030. Orexigen is actively developing a revised operational plan with the objective of maintaining operations that enable continued prescription supply and support of patients while quickly achieving and maintaining profitability.

## C. The Debtor's Corporate and Capital Structure

11.     Orexigen is a publicly traded company with its shares listed on The NASDAQ Global Select Market under the ticker symbol "OREX". Orexigen Ireland is a wholly owned foreign subsidiary of Orexigen and Orexigen LLC is a wholly owned subsidiary of Orexigen Ireland. The following is an organizational chart showing the organizational structure of the foregoing entities with nondebtor entities shaded in gray and the Debtor entity in white:



12.     As of the Petition Date, the Debtor's capital structure consisted of the following:

### The 2016 Secured Notes

13.     In March 2016, Orexigen closed an offering of $165 million in aggregate principal amount of 0% Convertible Senior Secured Notes due 2020 (the "2016 Secured Notes"), related warrants to purchase up to 21,999,999 shares of the Orexigen common stock (the "Warrants"), and 219,994 shares of Series Z Non-Convertible Non-Voting Preferred Stock (the "Series Z Preferred Stock"), to qualified institutional buyers and accredited investors (the "2016 Secured Note Purchasers") pursuant to a securities purchase agreement (the "2016 SPA"), dated March 15, 2016, by and between the Debtor and the Secured Note Purchasers. The offering was

led by funds managed by The Baupost Group, L.L.C. (collectively, "Baupost" and together with the other beneficial holders of the 2016 Secured Notes, the "Prepetition Secured Noteholders"), which, prior to the offering, was the holder of approximately 18.1% of outstanding Orexigen common stock.

14.    The 2016 Secured Notes were scheduled to mature on July 1, 2020, unless earlier repurchased, redeemed or converted in accordance with that certain Indenture, dated as of March 21, 2016, by and between the Debtor, as Issuer, and U.S. Bank National Association, as Trustee (in such capacity, the "Prepetition Indenture Trustee"), governing the issuance of the 2016 Secured Notes (the "2016 Indenture").

15.    In connection with the offering of the 2016 Secured Notes, the parties entered into a Security Agreement (the "Security Agreement" and together with the 2016 Secured Notes, 2016 Indenture and related documents, the "Secured Note Documents"), dated March 21, 2016, by and between Orexigen, the guarantors party thereto from time to time, and U.S. Bank National Association, as the collateral agent (in such capacity, the "Prepetition Collateral Agent"), pursuant to which Orexigen granted a first-priority security interest in substantially all of its current and future assets, including a pledge of 65% of its equity of Orexigen Ireland (the "Prepetition Collateral"), to secure its obligations under the 2016 Indenture. Orexigen Ireland and Orexigen LLC are not guarantors of the Notes.

16.    The 2016 Indenture provides that, upon the occurrence of certain fundamental changes or adverse events related to the regulatory approval for its drug product and commercialization, including net sales of Orexigen, as described in the 2016 Indenture, holders of the 2016 Secured Notes will, at their option, have the right to require Orexigen to repurchase for cash all or a portion of its 2016 Secured Notes at a repurchase price equal to 100% of the

aggregate principal amount of the 2016 Secured Notes. In particular, under the 2016 Indenture a fundamental change is deemed to occur if consolidated net product sales (a non-GAAP measure defined in the 2016 Indenture as Orexigen's net sales plus aggregate net sales by Orexigen's distributors outside the United States) are less than $100 million for fiscal year 2017 (the "Net Sales Milestone"). As discussed below, Orexigen anticipates narrowly missing this Net Sales Milestone, further precipitating the need for Orexigen to file this Chapter 11 Case.

17. Pursuant to sections 6.01 and 6.02 of the 2016 Indenture, an event of default occurred upon the Debtor's voluntary filing of this Chapter 11 Case and 100% of the principal of, and accrued and unpaid interest, if any, on all 2016 Secured Notes automatically became immediately due and payable. As of the Petition Date, the 2016 Secured Notes had an outstanding principal balance remaining of $165 million.

**The 2013 Notes**

18. In December 2013, Orexigen issued $115 million in aggregate principal amount of 2.75% Convertible Senior Notes due 2020 (the "2013 Notes") in an offering to qualified institutional buyers conducted in accordance with Rule 144A under the Securities Act of 1933, as amended.

19. Prior to the Petition Date, the 2013 Notes were scheduled to mature on December 1, 2020, unless earlier repurchased or converted in accordance with the terms of that certain Indenture, dated as of December 6, 2013, by and between Orexigen, as Issuer, and Wilmington Trust National Association, as Trustee (the "2013 Indenture"). The 2013 Notes are the Debtor's senior, unsecured obligations and rank senior in right of payment to any of the Debtor's indebtedness that is expressly subordinated in right of payment to the 2013 Notes; equal in right of payment to any of Debtor's unsecured indebtedness that is not so subordinated,

including the 2017 Exchange Notes (defined below); and effectively junior in right of payment to any of the Debtor's secured indebtedness (including the 2016 Secured Notes) to the extent of the value of the assets securing such indebtedness; and are structurally junior to all indebtedness and other liabilities (including trade payables) of the Debtor's subsidiaries.

20.     In December 2016, Orexigen repurchased approximately $35 million in face value of outstanding 2013 Notes for approximately $10 million in open-market transactions. In February 2017, Orexigen exchanged approximately $49.6 million in aggregate principal amount of the 2013 Notes for an equal principal amount of 2017 Exchange Notes (as discussed below). In November 2017, Orexigen agreed to exchange approximately $5 million in principal amount of the 2013 Notes for 1.6 million shares of Orexigen common stock.

21.     Orexigen pays 2.75% interest per annum on the principal amount of the 2013 Notes semi-annually in arrears in cash on June 1 and December 1 of each year. Pursuant to sections 7.01 and 7.02 of the 2013 Indenture, an event of default occurred upon Orexigen's voluntary filing of the Chapter 11 Case and 100% of the principal of, and accrued and unpaid interest, if any, on all 2013 Notes automatically became immediately due and payable.  As of the Petition Date, the 2013 Notes had an outstanding principal balance of $25.343 million.

**The 2017 Exchange Notes**

22.     In February 2017, Orexigen entered into an indenture, dated as of February 23, 2017 (the "2017 Indenture"), with U.S. Bank National Association, as trustee, governing Orexigen's new 2.75% Convertible Exchange Senior Notes due 2020 (the "2017 Exchange Notes"). Approximately $49.6 million in aggregate principal amount of the 2013 Notes were exchanged for an equal principal amount of 2017 Exchange Notes. The 2017 Exchange Notes are the Debtor's senior, unsecured obligations and rank senior in right of

payment to any of the Debtor's indebtedness that is expressly subordinated in right of payment to the 2017 Exchange Notes; are equal in right of payment to any of the Debtor's unsecured indebtedness that is not so subordinated, including the 2013 Notes; are effectively junior in right of payment to any of the Debtor's secured indebtedness (including the 2016 Secured Notes) to the extent of the value of the assets securing such indebtedness; and are structurally junior to all indebtedness and other liabilities (including trade payables) of the Debtor's subsidiaries.

23.     The 2017 Exchange Notes bear interest at a fixed rate of 2.75% per year, payable semi-annually in arrears on June 1 and December 1 of each year, beginning June 1, 2017. Interest on the 2017 Exchange Notes accrues from December 1, 2016.

24.     Prior to the Petition Date, approximately $9.2 million of principal value of the 2017 Exchange Notes had been voluntarily converted into approximately 800,000 shares of common stock and $1.4 million in cash. In addition, in November 2017, Orexigen agreed to exchange approximately $1.5 million of principal value of 2017 Exchange Notes for approximately 500,000 shares of Orexigen common stock.

25.     Pursuant to sections 7.01 and 7.02 of the 2017 Indenture, an event of default occurred upon the Debtor's voluntary filing of the Chapter 11 Case and 100% of the principal of, and accrued and unpaid interest, if any, on the 2017 Exchange Notes automatically became immediately due and payable.  As of the Petition Date, the 2017 Exchange Notes had an outstanding principal balance of $38.942 million.

**Other Unsecured Debt**

26.     In addition to the 2013 Notes and the 2017 Exchange Notes, the Debtor had unsecured obligations, as of the Petition Date, in the amount of approximately $38,000,000 consisting of accounts payable to various trade creditors.

**Orexigen Common and Preferred Stock**

27.    Since its inception, Orexigen has raised capital investment through numerous equity offerings totaling approximately $798,693,376.

28.    On April 26, 2007, Orexigen completed its initial public offering ("IPO") and sold 7,000,000 shares of common stock at a price of $12 per share to the public. The aggregate net proceeds received by Orexigen from the IPO, net of underwriting discounts and commissions and offering expenses, was $84 million.  Orexigen remains a publicly traded company with its shares listed on The NASDAQ Global Select Market.

29.    In connection with the 2016 Secured Notes, Orexigen issued 219,994 shares of Series Z Preferred Stock. The Series Z Preferred Stock is not convertible and does not pay or accrete dividends. The Series Z Preferred Stock is entitled to a liquidation preference upon a fundamental change.

30.    As of December 31, 2017, there were 18,887,033 shares of Orexigen common stock issued and outstanding and 219,994 shares of Series Z Preferred Stock issued and outstanding. On March 9, 2018, the closing price of Orexigen common stock was $1.40 per share.

**Assets and Intercompany Receivables**

31.    The Debtor has total assets of approximately $271.1 million consisting of cash, inventory, receivables, intellectual property and general intangibles.

32.    The Debtor has various intercompany agreements with Orexigen Ireland, including a license agreement and a Platform Contribution Transaction Agreement ("PCTA"). Per the PCTA, Orexigen Ireland is obligated to make annual payments of $14,561,320 each year

to Orexigen on August 31st from 2015 to 2019. As of December 31, 2017, Orexigen Ireland was obligated to the Debtor under the PCTA in an approximate amount of $29 million.

33.     The Debtor also has provided various loans to Orexigen Ireland since 2015.  As of December 31, 2017, the outstanding debt balance due from Orexigen Ireland to Orexigen is $58.5 million (the "Intercompany Loans").  The Intercompany Loans are due and payable at five years from the various loan dates with interest rates ranging from 1.22% to 1.95%.  Interest only payments are due on December 31st of each year.

34.     Additionally, in an effort to pool their resources to further develop and commercialize the drug product in countries outside of the U.S., Orexigen and Orexigen Ireland share certain development and clinical costs.  Orexigen performs certain services for Orexigen Ireland including, but not limited to, general, administrative, marketing, accounting, regulatory approval support, and supply chain, manufacturing and quality support.  The services performed by Orexigen are billed to Orexigen Ireland for reimbursement. As of December 31, 2017, Orexigen Ireland owed the Debtor approximately $5.5 million on account of these services.

35.     In total, the outstanding intercompany balance as of December 31, 2017 is $93 million in favor of the Debtor.

**D.     U.S. Drug Commercialization**

36.     Contrave® was launched in the United States in October 2014 by Orexigen's collaboration partner, Takeda.  In September 2010, Orexigen had entered into a collaboration agreement with Takeda to develop and commercialize Contrave® in the United States (as well as Canada and Mexico). Effective September 2013, the Debtor and Takeda entered into an amendment to the collaboration agreement pursuant to which Takeda assumed the responsibility to package the drug for commercial sale in the United States, Canada and

Mexico.   Under the terms of the original collaboration agreement, Orexigen received a nonrefundable upfront cash payment of $50 million and additional payments totaling $100 million that were earned between the execution of the collaboration agreement and the first commercial sale of the drug in the United States.

37.   In July 2015, Orexigen entered into a restated collaboration agreement (the "Restated Collaboration Agreement"), which amended and restated the original collaboration agreement that the parties first entered into in September 2010.  In addition to the Restated Collaboration Agreement, the parties also simultaneously agreed to a mutual release to, among other things, any claims or potential claims among the parties. However, due to a change in its overall business focus and objectives, in late 2015, Takeda began to adjust its priorities away from the commercialization and marketing of Contrave®.

38.   In March 2016, Orexigen entered into a separation agreement with Takeda that terminated the Restated Collaboration Agreement and related agreements (the "Separation Agreement").   The termination of the Restated Collaboration Agreement was effective on August 1, 2016 in connection with which certain rights and assets were transferred from Takeda to Orexigen.   In connection with the Separation Agreement, Orexigen made a $60 million payment for the acquisition of the drug product and related business and paid an additional $15 million in January 2017.   After the termination of the Restated Collaboration Agreement, Orexigen assumed full responsibility for the commercialization of Contrave® in the United States

39.   During the transition period from Takeda to Orexigen from March to August 1, 2106, Orexigen devoted resources to build a U.S. commercial infrastructure.  On August 1, 2016, Orexigen relaunched the drug with an effective and efficient U.S. commercial

organization, including 160 contract sales representatives, focused on the highly concentrated 20,000 health care practitioners who write the majority of prescriptions for branded and generic anti-obesity medicines.

40.     Following the successful relaunch of its commercial organization, Orexigen launched a direct-to-consumer program with broadcast and digital marketing to patients in December 2016.  In addition, Orexigen launched partnerships with two telemedicine partners, offering an innovative solution for patients to consult with a physician and, if appropriate, receive a prescription on-line.   As a result of these commercial initiatives, Orexigen sales in the U.S. grew approximately 60% in 2017, as compared to 2016.

41.     In December 2017, Orexigen launched its commercial campaign for the weight-loss season,[2] with a greater focus on more cost-efficient and targeted direct-to-consumer networks such as digital and social media.  Through the first two months of 2018, prescriptions for Contrave® have increased by approximately 21% over the same period in 2017.

42.     As described in greater detail in the Customer Program Motion, today the Debtor's commercialization and distribution of Contrave® is currently effected through a complex distribution and customer program network that is absolutely essential to driving increased prescription volumes and revenue, which includes: (a) a complex distribution network that utilizes a third party logistics provider to manage finished goods inventory and perform distribution and order-to-cash services and wholesaler arrangements to facilitate the distribution of inventory through numerous channels, including retail pharmacies; (b) the payment of rebates to managed care organizations ("MCO") and pharmacy benefit managers ("PBM") to gain access to a significant base of employees covered by the employer's insurance programs, which requires

---

[2] In the weight loss industry, a significant amount of annual net sales typically derive from sales between January and June of each year.

systems and controls for data processing and administration; (c) the provision of contracted and/or calculated discounted rates on the product for distributors, Governmental Entities (defined below) and 340B Covered Entities (defined below); (d) the pricing calculations, data processing and payment of Medicaid rebates; and (e) a return policy for expired or damaged product.

### E.     Drug Commercialization Outside the U.S.

43.     Orexigen has numerous distribution agreements for its drug product in various countries and regions all over the world, including South Korea, Central and Eastern Europe, Western Europe, Australia and New Zealand, South Africa, Canada, the Middle East and Latin America.  Approximately 94% of the potential global obesity market is subject to a distribution agreement, with the drug already commercially available in 23 countries in Europe, the Middle East and South Korea.  Net revenue from sales to partners outside of the U.S. totaled approximately $13 million in 2017.

44.     Specifically, Orexigen Ireland has entered into distribution agreements, local regulatory approval has been obtained and the product has been launched in (a) South Korea with Kwang Dong Pharmaceutical Company, Ltd.; (b) 19 countries in Central and Eastern Europe with Valeant Pharmaceuticals Ireland; (c) Spain with Laboratorios Farmacéuticos Rovi, S.A.; (d) in Italy with Bruno Farmaceutici S.p.A; (e) the UK and Ireland with Consilient Health Ltd; (f) Germany, France and Austria with Cheplapharm Arzneimittel GmbH, (launched in Germany); and (g) the Nordic countries, with Navamedic ASA.

45.     In addition, Orexigen has entered into distribution agreements with partners in other regions and is working with these partners to obtain the necessary regulatory approvals to permit drug commercialization and subsequent product launches: (a) in the Middle East (covering the countries of Saudi Arabia, the United Arab Emirates, Kuwait, Oman, Qatar,

Bahrain, Lebanon, Jordan, Iraq, Iran and Egypt), Orexigen has entered into a distribution agreement with Biologix FZCO; (b) in Australia, New Zealand and South Africa, Orexigen has a distribution agreement with iNova Pharmaceuticals ("iNova"); (c) in Canada, Orexigen entered into a distribution agreement with Valeant Pharmaceuticals Ireland; and (d) in Latin America, Orexigen has entered into a distribution agreement with Merck KGaA, Darmstadt, Germany (covering the countries of Brazil, Mexico, Argentina, Chile, Bolivia, Paraguay, Uruguay, Colombia, Ecuador, Peru, Venezuela, Honduras, Guatemala, Dominican Republic, Nicaragua, Panama, Costa Rica, Belize and El Salvador).

46.    In parallel, Orexigen is continuing partnership discussions for its drug product in other markets in the EU and other territories outside the United States, but its ability to generate revenue for the foreseeable future will depend primarily on its commercial success in the United States.

## F.    Events Leading to the Chapter 11 Case

47.    In 2010, after completion of the extremely thorough and costly clinical development program, an Advisory Committee to the FDA recommended the marketing approval of Contrave®. However, the FDA added a new but ambiguous requirement to produce new safety data from a large clinical trial prior to approval.  After reducing Orexigen's staff to 16 people to pursue a formal dispute resolution process with FDA, Orexigen gained clarity from the FDA a year later on the specific safety hurdle and study parameters required for approval. Following that clarity, Orexigen raised an additional $90 million in equity capital and $115 million in convertible debt from the 2013 Notes to help fund the safety assessment and continue the regulatory process. After meeting the required safety assessment, Orexigen ultimately gained regulatory approval for Contrave® from the FDA in 2014. The US commercialization launch by

Orexigen's partner, Takeda, began later that year. Orexigen also gained regulatory approval for Contrave® from the European Medicines Agency (EMA) in early 2015.

48.     In late 2015 and early 2016, due in large part to a shift in the overall strategic business focus of Takeda, Orexigen recognized an opportunity to potentially acquire Contrave® and implement a different and innovative set of commercialization strategies to drive continued growth of prescription volumes (and ultimately net sales). Although Orexigen executed the acquisition agreement in March 2016, through the nearly 5-month transitional period from Takeda to Orexigen, which was completed in August 2016, sales declined precipitously. Weekly prescription volume in August 2016 was approximately 19% lower than when Orexigen's acquisition of Contrave® was announced in March 2016.

49.     Orexigen's innovative commercialization plan required significant capital investment to return the product to a growing prescription volume trajectory and deliver the greatest long-term value to its investors.  As a result of these significant investments made with the objective of driving growth, Orexigen incurred significant losses and required additional capital to provide a bridge to profitability, which was projected to occur in 2019. Recognizing the need to address its debt and to raise additional capital, management took steps throughout 2017 to attempt to strengthen Orexigen's balance sheet and pursue a variety of sources to meet its capital needs.

50.     In February 2017, Orexigen executed a transaction that exchanged approximately $50 million of the 2013 Notes to the 2017 Exchange Notes. The 2017 Exchange Notes included a significantly lower conversion price as well as a mandatory conversion feature, which were designed with the intent of achieving conversions of the 2017 Exchange Notes based on an assumed continuation of stock price growth that was observed at the start of 2017.

Although approximately $9.2 million of those notes were converted and retired, further debt reduction through conversions was hindered by the ensuing stock price weakness.

51.     In March 2017, Orexigen established a $20 million controlled equity offering, which ultimately yielded only approximately $2.4 million of net proceeds as a result of the low trading volume and stock price weakness. Orexigen also pursued a non-dilutive Asset Based Loan ("ABL"), signing a term sheet with a lender for a $25 million facility. However, because closing the ABL required majority consent from the Prepetition Secured Noteholders and because it was a potential hindrance to a necessary restructuring involving a waiver of the Net Sales Milestone, the ABL was never completed.  In November 2017, in an effort to further reduce its level of debt, Orexigen exchanged $6.5 million of unsecured notes for approximately 2.1 million shares of common stock.

52.     In large part due to Orexigen's innovative commercialization plan, Orexigen recorded total net sales of $87.9 million in 2017. Although net sales in 2017 by Orexigen's distributors outside of the United States are not yet available, Orexigen estimates that such partner-reported net sales were approximately $10.1 million, bringing the total consolidated net sales in 2017 to approximately $98 million—a significant increase from 2016 but falling short of projected net sales, and insufficient to satisfy the Net Sales Milestone in the 2016 Indenture.  At the end of 2017, Orexigen had approximately $46 million in cash, cash equivalents, and marketable securities on its balance sheet and was facing a near-term liquidity crisis.

## G.     The Prepetition Restructuring Efforts

53.     In parallel with its efforts detailed above, Orexigen also began exploring potential strategic alternatives for maximizing the value of its business and began discussing

those strategic alternatives with Baupost, its largest Secured Noteholder.  The goal was to leverage the operating expenses necessary to support Orexigen's commercialization efforts through the purchase of additional complementary assets or, in the alternative, partner Contrave® with assets through the sale of Orexigen or its assets to a strategic partner.

54.    In April of 2017, Orexigen retained Torreya Partners ("Torreya") as its investment banker to assist it with a potential transaction.  Following public announcement of the engagement, Orexigen and Torreya met with numerous potential parties between August and November 2017.  A virtual data room was made available containing extensive information about Orexigen, including documents describing Orexigen's business and financial results in considerable detail, and potential purchasers had the opportunity to conduct due diligence via the virtual data room, as well as through meetings with Orexigen management.

55.    During this marketing process, however, it became apparent that there were various uncertainties that were inhibiting successful completion of the process.  One of these uncertainties related to the status of a patent infringement litigation involving Orexigen. In June 2017, a trial was held in U.S. District Court of Delaware regarding a challenge by a generic manufacturer against Orexigen and certain patents relating to Contrave®.  With a decision expected in a few months, many potential partners delayed significant diligence until a judgement was issued.  On October 13, 2017, Orexigen received a favorable decision, which confirmed exclusivity for Contrave® in the United States until 2030.

56.    Also during this time, Orexigen was in discussions with the FDA regarding the study design for a cardiovascular outcomes trial, a post-market requirement that was part of the original approval for Contrave® in the U.S.  Such studies are typically extremely large and costly, with traditional trial designs requiring $250 to $400 million to complete.  In

early 2017, Orexigen submitted to the FDA a protocol synopsis for an innovative study design involving a Bayesian statistical analysis approach, which essentially uses previously obtained data in combination with a significantly smaller and more efficient new study to complete the post marketing requirement. Such a design would be novel and potentially precedent-setting for this type of cardiovascular outcomes study and therefore the FDA required considerable time and further consultation with Orexigen prior to issuing an opinion. In February 2018, the FDA notified Orexigen of its approval of Orexigen's proposed study synopsis. With an estimated budget of $88 million to $108 million, the new study design represented significant cost savings of more than $100 million to Orexigen's operating model.

57.    The pending patent lawsuit and the pending FDA review likely served as deterrents to potential interested partners or purchasers and, as a result, Orexigen did not receive any feasible bids that could satisfy its current debt structure.  Throughout this marketing process, Orexigen met with its Prepetition Secured Noteholders to update them on the progress of its marketing efforts.

58.    Although Orexigen remained positive about its longer-term prospects and its ability to ultimately maximize value, it continued to be concerned with its highly levered capital structure and inability to generate positive free cash flow in the near term.  In addition, it became increasingly apparent that Orexigen may be unable to satisfy the Net Sales Milestone in the 2016 Indenture.  In November 2017, Orexigen retained Perella Weinberg Partners ("PWP") to provide general financial advisory services and expand Orexigen's efforts to evaluate potential strategic alternatives, including assisting Orexigen in any potential restructuring, sale transaction or financing transaction. One of Orexigen's goals in hiring PWP was to gain assistance with addressing the 2016 Secured Notes, possibly through a refinancing, an extension of the maturity

or a conversion of the 2016 Secured Notes to new debt or equity. Orexigen and PWP continued to frequently communicate with the Prepetition Secured Noteholders regarding a potential restructuring or financing transaction. Given that the Prepetition Secured Noteholders constitute Orexigen's only outstanding secured debt, Orexigen believed (and continues to believe) that the Prepetition Secured Noteholders' input and cooperation is invaluable to its restructuring efforts and this Chapter 11 Case.

59.     As discussed above, Orexigen and its advisors actively pursued numerous strategic options including raising new capital investment, obtaining an ABL, or entering into a consensual restructuring with its Prepetition Secured Noteholders, including a waiver in the Net Sales Milestone in the 2016 Indenture. Although Orexigen gained the support of a majority of its Prepetition Secured Noteholders, including Baupost, Orexigen was unable to obtain the unanimous consent of the Prepetition Secured Noteholders required to waive the Net Sales Milestone or otherwise engage in a meaningful out of court restructuring.

60.     While continuing to evaluate strategic alternatives with the assistance of its financial advisors, in December 2017, Orexigen engaged restructuring professionals at Ernst & Young LLP ("EY") to assist it in refining its business plan and examining the possibility of further cost reductions throughout late 2017 and early 2018, including through reductions in force both at Orexigen and its independent sales consultants. Orexigen remained hopeful that it could achieve a strategic transaction that would provide value for all stakeholders, including holders of its equity. Additionally, Orexigen implemented a reduction in force of 10 regional sales managers and 110 independent sales contractors, effective February 2, 2018.

61.     Orexigen ultimately concluded that given that (a) it was highly levered, (b) it was unlikely to satisfy the $100 million Net Sales Milestone in the 2016 Indenture, (c) it faced

20

significant challenges in achieving positive free cash flows in the near term, and (d) it was unable to obtain unanimous Secured Noteholder consent for a consensual restructuring of its debt, the business likely would not be viable on a stand-alone basis absent a strategic transaction or a restructuring of its debt.  To that end, Orexigen formalized discussions with Baupost and certain other Prepetition Secured Noteholders (together constituting approximately 93% of the 2016 Secured Notes) pursuant to non-disclosure agreements ("NDA"), regarding, among other things, a restructuring of the debt or a potential auction sale process. Orexigen, subject to these NDAs, further informed Baupost and other Prepetition Secured Noteholders of the details of Orexigen's business circumstances and the strategic alternatives available based on its efforts over the prior six months. In January 2017, Orexigen, Baupost and certain other Prepetition Secured Noteholders mutually agreed that, among the strategic alternatives to be considered, Orexigen could pursue an auction sale process that could be implemented through the filing of a chapter 11 case.

62.      Orexigen believed that on account of the significant investments it had made and intellectual "know-how" it had acquired in commercialization, patent protection, equipment, and development process, there might be significant value to a purchaser, particularly one with synergies to Orexigen's business.  Therefore, Orexigen conducted a second marketing process, in parallel with discussions with PWP, EY and the Prepetition Secured Noteholders, as an additional option to maximize value. To that end, PWP developed a list of potentially interested parties and solicited such parties' interest in a sale transaction.  PWP contacted 86 potential buyers, including financial buyers, privately-held specialty pharmaceutical companies, and a number of publicly-traded pharmaceutical companies.  Approximately 23 of the parties contacted by PWP entered into NDAs with Orexigen to further explore the potential purchase of

Orexigen's business. Among other things, the buyers were granted access to the virtual data room already established by Orexigen as part of the previous sale process. Orexigen established February 7, 2018 as the deadline for submitting non-binding preliminary proposals. The marketing process did not yield a credible preliminary proposal from a party willing to serve as stalking horse purchaser in an in-court auction sale process. Several parties, however, expressed interest in bidding at any potential 363 auction sale.

## II.    THE DIP FACILITY

63.     As part of the first day relief, the Debtor filed the *Motion For Entry of Interim and Final Orders, (I) Approving Debtor-in-Possession Financing Pursuant To 11 U.S.C. §§ 105(a), 362, and 364, Fed. R. Bankr. P. 2002, 4001 and 9014, and Local Bankruptcy Rule 4001-2 (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363 of the Bankruptcy Code (III) Granting Adequate Protection and Super-Priority Administrative Claims; (IV) Scheduling A Final Hearing; and (V) Granting Related Relief* (the "DIP Motion"). The DIP Motion seeks authority for the Debtor, on the terms set forth in that certain Debtor in Possession Credit and Security Agreement dated March 12, 2018 (the "DIP Loan Agreement") to obtain postpetition financing in an aggregate principal amount of up to $70,350,000, consisting of (i) up to $35,000,000 of New Money Loans,[3] (ii) $35,000,000 of Roll-Up Loans and (iii) a $350,000 Upfront Fee (collectively, the "DIP Facility"), from certain lenders party to the DIP Loan Agreement (the "DIP Lenders"), of which, upon entry of and pursuant to the Interim DIP Order (1) up to $7,500,000 of New Money Loans may be borrowed by the Debtor; (2) up to $7,500,000 of Roll-Up Loans may be incurred, which the Roll-Up Lenders will be deemed to have made to the Debtor at the same time and in the same amount as each New Money Loan is

---

[3] Capitalized terms not otherwise defined in this section have the meaning ascribed to them in the DIP Loan Agreement.

borrowed during the interim period; and (3) the Debtor will incur the Upfront Fee to the DIP Lenders (which will be deemed capitalized and added to the principal of the DIP Loans). Automatically upon entry of the Final DIP Order, the balance of the $35,000,000 Roll-Up Facility will be deemed borrowed.

64.    The terms of the DIP Facility also require the Debtor to complete a sale of its assets in accordance with certain milestones.  To maximize the value of its estate, and in compliance with the milestones under the proposed DIP Facility, the Debtor will file a motion seeking authority to conduct an auction process (the "Sale Motion") by which the Debtor will solicit offers and ultimately seek approval to sell substantially all of its assets to the bidder with the highest or otherwise best offer.  The Debtor also reserves the right to appoint a stalking horse purchaser of its assets and to modify its auction and sale procedures accordingly.  The Debtor also will seek authority to retain PWP to serve as its investment banker to assist with conducting the marketing and sale of its assets.  In order to maximize the likelihood of success of the sales process, the parties have also agreed to include in the Carve-Out from the collateral of the DIP Administrative Agent (defined below) for the benefit of the DIP Lenders, the Debtor's Key Employee Incentive Plan ("KEIP") and Key Employee Retention Plan ("KERP") as well as the fees and expenses of the Debtor's professionals.[4]

65.    I believe the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the extensive negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing.  As the DIP Facility proceeds are necessary and the best financing available at this time, I believe that sufficient justification exists for agreeing to these provisions.  Moreover, it is my

---

[4] The Debtor intends to file a motion seeking Court approval of the KEIP and KERP in conjunction with the Sale Motion and proposed bidding procedures within 3 business days following the Petition Date.

understanding that the DIP Lenders would not have been amenable to providing financing without the heavily bargained-for protections contained in the DIP Loan Agreement.

### A.    Marketing The DIP Facility

66.    Prior to the Petition Date, the Debtor, with the assistance of PWP and its other professionals, worked diligently to identify sources of working capital financing to determine if they could obtain postpetition financing on the most favorable terms or conditions available.  PWP reached out to more than 30 parties for postpetition financing proposals, with three parties ultimately submitting indicative proposals. All three indicative proposals sought to prime the Prepetition Secured Noteholders, who refused to consent to priming liens.

67.    Subsequently, certain holders of the Prepetition Secured Notes agreed to provide DIP financing on more attractive terms to the Debtor than the other indicative proposals. Certain of these holders made it clear, however, that they would not provide the required financing or consent to adequate protection provisions regarding their prepetition liens without (i) a roll up of a portion of the outstanding principal balance of the Prepetition Secured Notes, and (ii) milestones related to the Debtor's sale of its assets under section 363 of the Bankruptcy Code. After lengthy, arms'-length negotiations and trading numerous drafts of proposed term sheets, the parties settled on the arrangement described above and other terms described in the DIP Motion.

68.    One critical element of the negotiations was the inclusion of the payment of the Debtor's contemplated KEIP and KERP (both of which have been approved by the Debtor's Board of Directors) into the Carve-Out from the secured liens and obligations under the DIP Facility, which are necessary both to ensure that management is properly incentivized to support and drive an auction process that will yield the highest and best offer for the benefit of

the Debtor's estate and to retain non-management employees to continue work on the Debtor's business plan and preserve its value as a going concern.  The parties ultimately agreed that the way to ensure the payment of the KEIP and KERP was to include the program in the Carve-Out under the DIP Loan Agreement.  Although the parties understand such a structure is atypical, it is necessary here because the Debtor faces a unique set of circumstances that justifies their inclusion into the Carve-Out.  The Debtor, as a small biopharmaceutical company, depends on the successful commercialization of its product to become profitable. Following the reacquisition of its product from its former partner, the Debtor relaunched its product in August 2016.  To fund the build of its commercial infrastructure and relaunch its product, the Debtor needed secured debt to be added to its capital structure, which is now dominated by secured debt. Moreover, given the Debtor's expected cash flows, a traditional debt-for-equity plan of reorganization seems unfeasible.  Therefore, a section 363 sale is the primary, if not exclusive, vehicle available to the Debtor to maximize the value of its assets for its creditors and to continue the Debtor's business and preserve jobs.  The Debtor has already run two sales processes prepetition but was unable to secure a stalking horse bid before running very tight on liquidity, and therefore the DIP Facility is necessary to bridge the Debtor to the completion of a sale.  Finally, in light of the recent resignation of the Debtor's Chief Financial Officer immediately before the filing of the Chapter 11 Case, there is a credible concern that without iron-clad assurances that the KEIP and KERP (if approved) will be part of the Carve-Out, other senior executives and employees will do the same. Based on these peculiar facts, the DIP Lenders agreed to include the KEIP and KERP in the Carve-Out.

69.    Following extensive negotiations regarding these issues, and given the Debtor's working capital needs and the means by which the Debtor will seek to maximize the

value of its assets, the DIP Lenders ultimately agreed to provide the DIP Financing on more attractive terms to the Debtor than the other indicative proposals. The Lenders have offered to provide the DIP Facility to address the Debtor's anticipated working capital needs during the pendency of this Chapter 11 Case. The DIP Lenders are Required Holders because they hold in the aggregate the requisite amount of Prepetition Secured Notes, and as such consent to the priming of the liens securing the Prepetition Secured Notes.

72.     In their capacity as Prepetition Secured Noteholders, the DIP Lenders already have a vested interest in seeing the value of the Debtor's business preserved and maximized.  One or more of the DIP Lenders made inquiries with other Prepetition Secured Noteholders regarding participation in the DIP Facility, but not all Prepetition Secured Noteholders were willing to commit the significant amounts of additional capital contemplated under the DIP Facility.

71.     The Debtor requires access to liquidity from the DIP Facility and use of cash collateral in order to facilitate a smooth transition into chapter 11, to avoid serious impairment of its business operations, to operate the Debtor's cash-intensive business in the ordinary course, and to implement an auction process to maximize the value of the Debtor's assets.  A contested priming or adequate protection fight could have proved devastating to the Debtor's business and to the contemplated auction process, subjecting the Debtor to a significant risk of being unfinanced or underfinanced for an extended period of time, especially in light of the Debtor's low liquidity position as of the Petition Date.

72.     As discussed above, the Debtor and its advisors considered a variety of potential transactions, including refinance and sale options.  Based on all of the factors described herein, the Debtor deemed that it was in the best interests of its business to commence the Chapter

11 Case and effectuate a sale to maximize the value of its assets.  The Debtor also has determined that the DIP Facility presents the only viable mechanism for providing the liquidity that the Debtor requires to continue its operations during the Chapter 11 Case.  In addition, the Debtor has determined that a prompt and open sale of its assets in which all interested buyers are encouraged to participate is the best way to maximize value for its estate under the circumstances.

## B.    The Terms of the DIP Facility are Fair and Reasonable

73.    The proceeds of the DIP Facility are sized to support the Debtor through the anticipated pendency of the Chapter 11 Case and preserve and promote the health and viability of the business.  Moreover, I believe that the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the negotiations that took place, I believe that these are the only terms on which the DIP Lenders will provide the financing. In addition, I am generally aware that terms similar to those included in the DIP Loan Agreement have been approved in other recent and/or ongoing cases.

74.    It is my further understanding that any alternative financing arrangement, including arrangements provided by other potential DIP lenders, likely would have led to a lengthy and almost certain value-destroying priming fight. Moreover, I understand that the DIP Lenders would not have been amenable to providing financing without the bargained-for provisions.  In the course of negotiations with the DIP Lenders, the Debtor explored whether the DIP Lenders would provide the DIP Facility with lower or no associated fees and free from procedural milestones.  The DIP Lenders made clear that they would not be willing to provide the DIP Facility on more favorable terms.

75.    Accordingly, the Debtor and its advisors—recognizing the absence of better competing proposals and the benefits to be provided under the DIP Facility—determined

in their sound business judgment that the terms of the DIP Loan Agreement were and remain superior to any other set of terms reasonably available to the Debtor at this time. I therefore believe that the DIP Facility provides the Debtor with the best, most feasible and most value-maximizing financing option available at this time.

**C.      The Terms of the Debtor's Cash Collateral Use are Fair and Reasonable**

76.      In addition to the DIP Facility, the Debtor requires the continued use of cash collateral (as defined in section 363(a) of the Bankruptcy Code, the "<u>Cash Collateral</u>").  The Prepetition Collateral Agent has consented to the Debtor's continued use of Cash Collateral and the Adequate Protection Package (as defined below), subject to the terms of the form of order approving the DIP Facility on an interim basis (the "<u>Interim DIP Order</u>").

77.      I believe that continued access to Cash Collateral will (i) ensure that the Debtor has access to sufficient working capital to, among other things, pay its employees, vendors, and suppliers, (ii) enable the Debtor to continue honoring its prepetition obligations under and in accordance with the "first-day" orders entered by the Court, and (iii) satisfy administrative expenses incurred in connection with the commencement of the Chapter 11 Case.

**D.      The Adequate Protection Package is Justified under the Circumstances**

78.      The Debtor and the Prepetition Collateral Agent have agreed that the Debtor will provide the following primary forms of adequate protection: (the "<u>Adequate Protection Package</u>"):

- The Prepetition Collateral Agent, for the benefit of the Prepetition Secured Noteholders, shall be granted, effective and perfected as of the Interim DIP Order Entry Date and without the necessity of the execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or other agreements, a valid and perfected security interest in and lien on all assets of the Debtor and in the same relative priority and to the same extent, priority, enforceability, unavoidability and validity applicable to the respective Prepetition Secured Parties' Prepetition Liens in the Pledged Collateral, which

liens and security interests are junior and subordinate only to (i) the Carve-Out, (ii) the DIP Liens, (iii) the DIP Obligations, (iv) the Super-priority Claims of the DIP Administrative Agent, and (v) the Permitted Exceptions.

- Pursuant to and upon the entry of the Final DIP Order, the Prepetition Collateral Agent, on behalf of the Holders, shall be granted, subject to the Carve-Out, an allowed Super-priority Claim junior only to the Super-priority Claim of the DIP Administrative Agent and any Permitted Exceptions; provided that the Trustee and the Prepetition Collateral Agent and Holders shall not receive or retain any payments, property or other amounts in respect of such Super-priority Claim unless and until the DIP Obligations have indefeasibly been paid in cash in full.

- The Debtor shall make current cash payments payable under the Prepetition Note Documents to the Trustee or the Prepetition Collateral Agent for all professional fees and expenses incurred by the Trustee or Prepetition Collateral Agent in connection with enforcement of the Prepetition Note Documents and the Chapter 11 Case, subject to the delivery of a Fee Notice, as defined in, and in the manner set forth in the Interim DIP Order.

- The Debtor shall (a) provide the Trustee and its advisors with unaudited quarterly financial statements within sixty (60) calendar days after the conclusion of each quarter, and (b) shall provide the Trustee with any other reporting as reasonably required by the Required DIP Lenders.

79. The Adequate Protection Package will adequately protect the Prepetition Secured Noteholders' interests in the Prepetition Collateral from diminution in value caused by the Debtor's use of the Cash Collateral, as well as for any decline in, or diminution of, the value of the Prepetition Secured Noteholders' liens or security interests under any of the Secured Note Documents.

## E.    The DIP Facility Was Negotiated in Good Faith

80. The Debtor and its advisors have determined that the DIP Lenders offered the most viable option for obtaining the postpetition financing the Debtor requires.  I believe that the DIP Loan Agreement is the result of the Debtor's reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to timely obtain needed postpetition

financing, and reflective of arms'-length, good faith negotiations between the Debtor, the DIP Administrative Agent, and DIP Lenders.

**F.      The Debtor Requires Immediate Access to the DIP Facility and Cash Collateral**

81.      The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested in the DIP Motion is not granted, including authorizing the Debtor's use of Cash Collateral and borrowings (or deemed borrowings) of up to $15.35 million under the DIP Loan Agreement.  I further believe that the commencement of the Chapter 11 Case will materially increase demands on the Debtor's free cash as a result of, among other things, the costs of administering the Chapter 11 Case and addressing key customers' concerns regarding the Debtor's financial health and ability to continue operations.

82.      The Debtor has an immediate need for access to liquidity to, among other things, continue the operation of its business in an orderly manner, maintain business relationships with customers and vendors, pay employees and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtor's going-concern value and, ultimately, effectuate a successful restructuring.  Based on these circumstances, the Debtor requires the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to its operations, business and estate.

### III.      FIRST DAY PLEADINGS

83.      Concurrently with the commencement of the Chapter 11 Case, the Debtor has filed, and requests this Court's approval for, a number of proposed orders (the "First Day Orders"), which the Debtor believes are necessary to enable it to operate with a minimum level of disruption and loss of productivity.  The Debtor requests that each of the First Day Orders be entered as critical elements in stabilizing and facilitating the Debtor's operations during the

pendency of the Chapter 11 Case.  A description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

## A.        Administrative and Procedural Matters

84.        The Debtor has filed three "administrative" pleadings that seek to (1) to retain Kurtzman Carson Consultants ("KCC") as claims and noticing agent, (2) extend the time for the Debtor to file its schedules and statements, and (3) an equity and claims trading procedures motion. The Debtor's attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

### Application to Appoint KCC as Claims and Noticing Agent

85.        It is my understanding that the Debtor is applying (the "Section 156(c) Application") for entry of an order appointing KCC as claims and noticing agent in this Chapter 11 Case. I understand that such appointment is required by the rules of this Court. Moreover, I believe that such relief is prudent in light of the thousands of creditors, potential creditors and parties in interest to whom certain notices will be sent.

86.        I believe that KCC's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Case and of other developments in this Chapter 11 Case. Moreover, I am informed that KCC has acted as the claims and noticing agent in numerous cases of comparable size, including several large bankruptcy cases pending in both this District and in other districts. Moreover, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the District of Delaware, the Debtor obtained and

reviewed engagement proposals from three other Court-approved claims and noticing agents to ensure selection through a competitive process.

87.     As more fully detailed in the Section 156(c) Application, I understand that KCC will engage in certain Claims and Noticing Services, including, but not limited to, transmitting, receiving, docketing and maintaining proofs of claim filed in connection with this Chapter 11 Case. KCC will also work with the office of the Clerk of the United States Bankruptcy Court for the District of Delaware to ensure that its methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of any order entered by this Court. Moreover, I am informed that the Section 156(c) Application pertains only to the work to be performed by KCC under the Clerk of the United States Bankruptcy Court for the District of Delaware delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 2002-1(f).[5]

88.     Accordingly, I believe that retention of KCC, an independent third party with significant experience in this role, to act as an agent of the Court, is in the best interests of the Debtor and its estates and creditors.

<u>Extension of Time to File Schedules and Statements</u>

89.     It is my understanding that the Debtor is requesting that the Court extend the time by which the Debtor must file its schedules of assets and liabilities and statements of financial affairs (the "<u>Schedules and Statements</u>") to thirty two (32) days after the current deadline. It is my understanding that the Local Bankruptcy Rules automatically extended the Debtor's deadline twenty-eight (28) days because the Debtor filed a creditor matrix containing

---

[5] The Debtor also intends to file an application to retain KCC to perform certain administrative services pursuant to Bankruptcy Code section 327.

more than two hundred (200) creditors. Thus, the Debtor is requesting the Court to extend the deadline to file Schedules and Statements to May 11, 2018 (the "Filing Deadline").

90.     Given the substantial burdens already imposed on the Debtor's management by the commencement of this Chapter 11 Case, the limited number of employees available to collect the information, the competing demands upon such employees and the time and attention that the Debtor must devote to the Chapter 11 process, the Debtor may be unable to complete its Schedules and Statements by the current deadline imposed by the Bankruptcy Rules and the Local Bankruptcy Rules. I also believe that the relief requested is in the best interest of the Debtor, its estate, creditors and other parties in interest.

91.     Accordingly, I believe that "cause" exists to extend the current deadline imposed by Bankruptcy Rule 1007(c) for an additional thirty two (32) days, until the Filing Deadline. The requested extension will enhance the accuracy of the Debtor's Schedules and Statements and avoid the necessity of substantial subsequent amendments.

<u>Trading Procedures Motion</u>

92.     The Debtor has generated, and is currently generating, a significant amount of Tax Attributes for U.S. federal income tax purposes. The Debtor has experienced losses from the operation of its business, having failed to post positive net earnings since its inception.  As a result, the Debtor estimates that its utilizable federal income tax net operating losses are approximately $350 million to $400 million ("NOLs"), consisting of approximately $200 million of NOLs through 2016 and $150 million to $200 million of NOLs generated during 2017, and it expects to have incurred additional NOLs since then through the Petition Date, which amounts could be even higher when the Debtor emerges from chapter 11.  The Debtor's Tax Attributes are a valuable asset because the Debtor generally can carry forward its Tax Attributes to reduce or eliminate its income tax liability, thereby potentially freeing up funds to

meet working capital requirements and service debt. In particular, the Tax Attributes may be available to the Debtor to offset taxable income generated by ordinary course activity and other transactions completed during the course of the Chapter 11 Case.  Additionally, the Debtor can carry forward the NOLs and credits to reduce its future tax liability, thereby potentially recovering cash for the benefit of its estate.

93.    It is my understanding that the Debtor's ability to use its Tax Attributes, however, could be severely limited under Section 382 of title 26 of the United States Code as a result of the trading and accumulation of its equity securities and claims against the Debtor prior to consummation of a chapter 11 plan.  The Debtor thus seeks to establish procedures for continuously monitoring the trading of its equity securities and provide notice of the potential that it will seek certain sell-down procedures for claims so that the Debtor can preserve its ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of its NOLs under Section 382. Therefore, I submit that the relief requested in the Trading Procedures Motion is appropriate and in the best interests of the Debtor's estate, its creditors and other parties in interest.

**B.    Motion to Continue Cash Management System**

94.    The Debtor seeks entry of an interim order, pending the entry of a final order or the interim order becoming a final order, authorizing, but not directing, the Debtor to continue to operate its existing cash management system in the day-to-day operation of its businesses, and to honor certain prepetition obligations in accordance with the operation of the cash management system.  Specifically, the Debtor requests authority to: (a) continue to use, with the same account numbers, each of its existing bank accounts; (b) treat the bank accounts for all purposes as accounts of the Debtor as debtor in possession; and (c) conduct banking

transactions by all usual means and debit the bank accounts on account of all usual items and payment instructions.

95.    Additionally, the Debtor seeks authority to: (a) use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to its bank accounts, without reference to the Debtor's status as debtor in possession; and (b) continue intercompany transactions between and among the Debtor and is nondebtor affiliates in the ordinary course of business and in accordance with transfer pricing agreements and historical practices.  The Debtor further requests authority for its banks to: (i) continue to maintain, service, and administer its bank accounts; (ii) debit its bank accounts in the ordinary course of business on account of (a) all checks drawn on its bank accounts that are cashed at its banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (b) all checks or other items deposited in one of the bank accounts at the banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any bank as fees or service charges for the maintenance of any aspect of the applicable cash management system.

96.    Further, the Debtor requests that the Court grant interim and final waivers of the requirements of section 345(b) of the Bankruptcy Code.  The Debtor also requests that, upon entry of the interim order, the Court schedule a final hearing on the motion to consider the relief requested on a final basis.

<u>The Cash Management System</u>

97.    The Debtor maintains an integrated cash management system (as described herein, the "<u>Cash Management System</u>"), comprising four accounts (the "<u>Bank</u>

35

Accounts") at two financial institutions.  Attached as Exhibit C to the Cash Management Motion is a table identifying the Bank Accounts, along with the financial institutions at which they are held (the "Banks"), and the last four digits of each Bank Account number.

98.     The Cash Management System is centrally managed for the Debtor out of the Debtor's U.S offices in San Diego, California, and all funds in the Bank Accounts are denominated and held in U.S. Dollars.  The Debtor uses the Cash Management System in the ordinary course of business to collect, transfer, and disburse funds generated from its operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtor's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Additionally, the Debtor regularly reconciles books and records to ensure that all transfers are accounted for properly.

### The Bank Accounts

99.     U.S. customer payments are made to an account receivable lockbox account at Silicon Valley Bank in the name of Orexigen Therapeutics, Inc. (the "AR Account"). The AR Account is swept daily into a general checking account at Silicon Valley Bank in the name of Orexigen Therapeutics, Inc. (the "Checking Account").  The Checking Account is also swept daily into a sweep account at Silicon Valley Bank in the name of Orexigen Therapeutics, Inc. (the "Sweep Account"), which holds excess cash and investments in U.S. Short-term Treasury and government securities.  Funds are transferred from the Sweep Account to the Checking Account as necessary for disbursements to fund payroll and operations.

100.    The Debtor also maintains a holding account at U.S. Bank (the "Holding Account") for excess cash and investments in short-term U.S. Government securities.  The Holding Account is managed by Wells Fargo.  The Debtor transfers funds, as necessary, from the

Checking Account and also the Debtor's non-debtor affiliates transfer funds from foreign accounts to the Holding Account.

101.    A diagram illustrating the foregoing Cash Management System is attached as Exhibit D to the Cash Management Motion.

Bank and Investment Fees

102.    The Debtor pays on average approximately $850 per month in bank and investment fees incurred in connection with the Bank Accounts (the "Bank Fees").  The Debtor pays the Bank Fees as they come due on a rolling basis over the course of each month, typically by direct debit.  The Debtor estimates that there are no outstanding Bank Fees as of the Petition Date.

Business Forms

103.    As part of the Cash Management System, the Debtor utilizes numerous preprinted business forms (the "Business Forms") in the ordinary course of its business.  The Debtor also maintains books and records to document, among other things, receipts and expenses.  To minimize expenses to its estate and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of this Chapter 11 Case, the Debtor requests that the Court authorize its continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtor's status as debtor in possession, rather than requiring the Debtor to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

**C.      Payment of Employee and Payroll Obligations and Certain Taxes**

**<u>Employee Salary and Expense Obligations</u>**

104.    The Debtor has approximately 111 employees in the U.S. (the "<u>Employees</u>") that conduct its normal business, including executive, management, financing and accounting, information technology, legal, and actuarial services.

**(i)      *Payroll***

105.    All Employees are paid twice monthly, on the 15th and last day of each month.  If either of these days falls on a weekend or holiday, employees are paid the day before the weekend or holiday.  All required tax deductions and voluntary deductions are withheld automatically from paychecks.  The Debtor's twice monthly Employee-related payroll obligations equal approximately $865,000. The Debtor pre-funded ADP (defined below) on March 9, 2018 with the amounts necessary to satisfy the Employee-related payroll obligations due on March 15, 2018 to ensure that payroll would be processed on time.  Although the Debtor does not anticipate owing any money on account of prepetition wages and salaries, out of an abundance of caution, the Debtor is seeking authority, but not direction, to pay prepetition Employee-related payroll obligations in an aggregate amount not to exceed $100,000 in the interim period.

**(ii)      *Payroll Servicers***

106.    Debtor utilizes ADP, LLC ("<u>ADP</u>") as payroll service provider for Employees.  ADP performs all services related to the Debtor's Employee payroll, including payroll deductions and tax withholdings.  Each payroll period, the Debtor pre-funds ADP with the amounts necessary to satisfy the Debtor's payroll obligations two (2) business days in advance of the pay date.  ADP then processes direct deposit transfers or checks.  The services that ADP provides are critical to the smooth functioning of the Debtor's payroll system.  ADP is

responsible for ensuring that (i) Employees are paid on time, (ii) appropriate deductions are made, (iii) payroll reporting is accurate, and (iv) appropriate amounts are remitted to the applicable taxing authorities and other payees.  The Debtor pays ADP approximately $2,000 per month for the aforementioned services (the "Payroll Maintenance Fees").  As of the Petition Date, the Debtor estimates that it owes ADP approximately $4,000 on account of prepetition Payroll Maintenance Fees.  The Debtor seeks authority to pay all Payroll Maintenance Fees in the ordinary course, including all prepetition fees.

   **(iii)** ***Payroll Deductions and Tax Withholdings***

    107. ADP deducts certain amounts from Employees' paychecks, including, without limitation: (i) pre-tax, optional contributions to health and dependent care, as described in detail below; (ii) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below; (iii) certain amounts related to federal, state, and local income taxes, social security taxes, Medicare taxes, and taxes imposed by the law; (iv) matching payments on account of social security and Medicare taxes and, subject to certain limitations, additional amounts based upon a percentage of gross payroll for, among other things, state and federal unemployment insurance and (v) other miscellaneous deductions.  The Debtor estimates that ADP withholds, on average, approximately 54% of each payroll in payroll deductions and tax withholdings from Employees' paychecks, collectively. The Debtor pre-funds payroll deductions and tax withholdings to ADP two (2) business days in advance of the pay date. The Debtor's average liabilities twice-monthly for payroll deductions and tax withholdings total approximately $467,000.  The Debtor estimates that, as of the Petition Date, its liability for payroll deductions and tax withholdings is in the approximate amount of $30,000. The Debtor is seeking authority, but not direction, to remit prepetition payroll deductions and tax withholdings in an aggregate amount not to exceed $30,000 in the interim period.

108.    In the ordinary course of processing payroll for the Employees, the Debtor may also be required by law, in certain circumstances, to withhold from certain Employees' wages amounts for various garnishments, such as tax levies, child support, and other court-ordered garnishments.    Each pay cycle, the Debtor withholds such amounts from applicable Employees' paychecks and remits them to the appropriate authorities or entities on a monthly basis.  On average, the Debtor withholds approximately $2,000 in garnishments per month from Employees' wages and salaries and estimate that, as of the Petition Date, it holds approximately $3,000 in prepetition garnishments that have not yet been remitted.  The Debtor seeks authority to continue garnishing Employee wages in accordance with applicable law.

(iv)    *Expense Reimbursement*

109.    In the ordinary course of business, the Debtor reimburses Employees for certain expenses incurred while performing their duties.    Reimbursable expenses include payments for travel, lodging, reimbursable meals, business meals and entertainment, and other business-related activities.    Non-executive staff (below Vice President-level) are entitled to expense reasonable and necessary business-related expenses while traveling on authorized company business.  Travel expenses higher than those outlined in the Employee Handbook must be pre-approved by the Chief Financial Officer ("CFO").  Executive Staff (Vice President-level and above) must also follow guidelines as outlined in the Employee Handbook; however, expenses higher than those outlined must be approved by either the CFO or respective Vice President.    Employees submit expense reports via SAP Concur ("Concur") when needed. Reports are then automatically routed to the Employee's respective manager for review and electronic approval.  Once approved by the manager, the expense report is routed to Accounts Payable for review.  Accounts Payable reviews and processes the report for payment.  Payment files are processed every day by Concur at 6:00 pm Pacific.  Concur then transfers the funds to

the Employee approximately two (2) business days after the payment file is processed (e.g., if a payment file is processed on Monday, a corresponding ACH payment is made to the Employee on Wednesday).

110.    The Debtor estimates that, on average, it is charged $210,000 in Employee expense reimbursements per month.  As of the Petition Date, the Debtor believes it is obligated to pay for approximately $150,000 in outstanding prepetition expense reimbursements.

**Employee Benefits**

111.    The Debtor also provides Employees with access to health and other benefit plans.  For Employees, benefit plans include the following (along with a notation as to whether the Debtor or the Employee pays the applicable premium or cost):

| Benefit Plan | Premiums Paid By |
|---|---|
| Medical | Orexigen Pays 85% |
| Dental | Orexigen Pays 85% |
| Vision | Orexigen Pays 85% |
| Basic Life Insurance | Orexigen Pays 100% |
| Basic Accidental Death & Dismemberment | Orexigen Pays 100% |
| Voluntary Insurance | Employee Pays 100% |
| Voluntary Accidental Death & Dismemberment | Employee Pays 100% |
| CIGNA Long-Term Disability | Orexigen Pays 100% |
| CIGNA Short-Term Disability | Orexigen Pays 100% |
| Orexigen 401(k) Plan | Orexigen and Employee |
| CONTRAVE Self-Funded Drug Plan | Orexigen Pays 100% |

112.    The Debtor is the primary contract party with the applicable coverage provider on the foregoing U.S. benefit programs, and is also the sponsor of the Orexigen 401(k) Plan.

**(i)     *Medical, Dental and Vision Plans***

113.    The Debtor offers coverage to eligible Employees, their spouses, and their dependents for medical, dental, vision, and other related benefits.  All full-time Employees are

eligible for these benefits (subject to the terms, conditions, and limitations of each program). Part-time employees may be eligible for the benefits package at the sole discretion of the Debtor (subject to the terms, conditions, and limitations of each program).

114.    Debtor offers medical, dental, and vision insurance plans to eligible Employees through CIGNA Health and Life Insurance Co. ("CIGNA").  The Debtor offers both OAP and HMO medical plans.  The Debtor initially pays 85% of the monthly premiums under the medical, dental and vision plans for each eligible U.S. Employee and his or her spouse and dependents.

115.    In an average month, Debtor pays approximately $160,000 in premiums under the medical, dental and vision plans.  As of the Petition Date, the Debtor does not owe any prepetition premiums under these plans.

**(ii)    *Life and Accidental Death and Dismemberment & Long-Term and Short-Term Disability Insurance***

116.    All of the Debtor's full-time Employees and their eligible dependents receive basic life insurance and accidental death and dismemberment coverage ("AD&D"), plus long-term ("LTD") and short-term disability ("STD") insurance.  The Debtor initially funds 100% of the premiums under these plans for Employees.  In an average month, Debtor pays approximately $15,000 in premiums under these plans, payable monthly in advance.  As of the Petition Date, the Debtor does not owe any prepetition premiums under these plans.  The AD&D benefit is equivalent to 100% of an Employee's salary up to a maximum of $200,000 (amounts greater than $200,000 will require a health statement).  STD includes an elimination period of zero (0) days for an accident and seven (7) days for a sickness.  The benefit pays 66.67% of an employee's weekly earnings, up to a weekly maximum of $2,500. LTD includes an elimination

period of 90 days.  The benefit pays 66.67% of an employee's monthly earnings, not to exceed $10,000 per month.

117.    Eligible Employees may purchase supplemental personal insurance coverage.  Participating Employees pay premiums for supplemental insurance through payroll withholding, which is then remitted to the appropriate provider.  Employees may purchase additional life and AD&D insurance in $10,000 increments, not to exceed $300,000 (guarantee issue amount $100,000).  Spouses and children of employees may also purchase additional life and AD&D insurance.

(iii)    *COBRA Medical, Dental and Vision Coverage*

118.    Former Employees are entitled to continue to participate in the Debtor's healthcare, dental and vision insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 (as amended, "COBRA") for up to 18 months following the end of their employment (such coverage, the "COBRA Coverage").  Former Employees who elect to participate in the COBRA Coverage must pay a set amount, dependent on which type of plan they elect (*i.e.*, family or individual) to the Debtor's healthcare insurance provider.  The Debtor currently has ten (10) former employees terminated prepetition that are currently entitled to participate in COBRA Coverage at the Debtor's cost for up to three (3) months past the Petition Date at a total cost of approximately $15,200 per month including fees to IGOE Administrative Services ("IGOE Fees").  Additionally, one former employee is entitled to participate in COBRA Coverage at the Debtor's cost for up to nine (9) months past the Petition Date at a cost of approximately $1,000 per month including IGOE fees. The COBRA Coverage amounts billed to and paid by the Debtor for the months of January, February and March 2018 averaged approximately $4,000 per month.

(iv)    *Workers' Compensation Insurance*

119.    Debtor maintains a workers' compensation insurance policy that covers all Employees.  The Debtor requests authority to continue the workers' compensation insurance policy in the ordinary course of business in its motion to maintain insurance programs, filed contemporaneously with this Motion.

(v)    *Paid Time-Off Benefits*

120.    Employees accrue paid vacation days based on position and years of service (see the chart below for details).  Employees in the part-time category (less than 30 hours a week) may accrue vacation time on a pro-rata basis with written approval of the Debtor. Temporary employees do not accrue vacation.  Employees begin to accrue vacation on their start date, and are eligible to utilize the benefit as work schedules permit. Once the maximum accrual cap is reached (in accordance with the chart below), vacation will no longer be accrued until the accrued vacation drops below the cap.  No Employee is permitted to use vacation time prior to actual accrual without the written approval of his or her manager.  The Debtor does not "cash out" Employees for unused accrued vacation time at the end of the calendar year or at any other time while Employees remain employed by the Debtor.  Upon termination, Employees are paid for accrued and unused vacation time that has been earned through the last day of work.  The Debtor, from time to time, may require Employees to use vacation on specified days, with advanced written notice.  Vacation time does not accrue while an Employee is on unpaid leave. As of the Petition Date, the Debtor's liability for accrued vacation time is estimated at approximately $1,000,000. Under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, certain obligations related to wages, salaries, commissions, vacation, severance, sick leave, and employee benefit plans are accorded priority in payment in an amount not to exceed $12,850 for each employee to the extent such amounts accrued within 180 days of the petition date. As of the

44

Petition Date, the Debtor estimates that approximately 64 Employees had accrued vacation time that exceeded the priority cap totaling approximately $460,000. The remaining balance of accrued vacation time estimated by the Debtors at approximately $540,000 however is not a current cash-payment obligation as the Debtor's policy states that it is only to be paid out upon the Employee's termination.

121.    The following is a chart that summarizes the Debtor's paid time-off benefits:

| Position | Years of Service | Hours Accrued per Pay Period | Annual Accrual Rate Number of Days | Maximum Accrual Cap in Days |
|---|---|---|---|---|
| Vice President and above | 1 to 3 years | 6.67 hours | 20 days | 30 days |
| | 4 to 10 years* | Depends on years of service | 20 days **PLUS** accrual of 1 additional day/ each year of service; cap at 30 days | An amount equivalent to 1.5 times your then applicable annual accrual rate** |
| Those employees below the title of Vice President | 1 to 3 years | 5 hours | 15 days | 22.5 days |
| | 4 to 10 years* | Depends on years of service | 15 days **PLUS** accrual of 1 additional day/ each year of service; cap at 22.5 days | An amount equivalent to 1.5 times your then applicable annual accrual rate** |

*Effective on your anniversary date.
**For example, if you have an annual accrual rate of 25 days,  your maximum accrual cap will be 37.5 days.

122.    Each calendar year, eligible Employees receive five (5) paid sick days, and eligible offshore employees receive ten (10) paid sick days.  Unused sick days do not roll over to the next calendar year.   The full amount of sick leave will be granted at the commencement of employment, and thereafter on January 1 of each year. Unused sick leave will

expire on December 31 of each year. Accrued but unused paid sick leave does not carry over from year-to-year and will not be paid out at any time, including upon termination of employment.

123.     Eligible Employees are also afforded paid time off each year of up to ten (10) days for bereavement and up to ten (10) days for jury duty.  Employees are not disciplined for taking time off to perform their duties as volunteer firefighters, peace officers, or emergency rescue personnel.  Employees may use any accrued vacation for these community service activities; otherwise, this time is unpaid. Employees are paid for official holidays.  Employees are also eligible for unpaid leaves of absence consistent with the Uniformed Services Employment and Reemployment Rights Act and other applicable federal and state laws.  Other paid or unpaid leaves of absence may be granted upon prior approval of the Debtor's chief executive officer.

### (vi)     *Employee Wellness and Development Programs*

124.     Debtor provides employees with a Wellness Program to encourage Employees to strive for good health both as individuals and collectively as a team.  This plan does not include direct payment from the Debtor.  Instead, if an Employee opts-in, that Employee's medical, dental, and vision benefits are 85% covered (as opposed to 75% covered if the employee does not opt-in).  As of the Petition Date, the percentage of Employees that opt-in to this program is nearly 100%.

### (vii)    *Contrave® Self-Funded Drug Plan*

125.     The Debtor provides Employees with a Contrave® Self-Funded Drug Program through Ridgeway. The payment to Ridgeway averages $2,000 per quarter encompassing a $7 per order processing fee plus the cost of the product.

(viii)    *Retirement Plans*

126.    Debtor sponsors a 401(k) retirement savings plan for the benefit of eligible Employees and former Employees.  All such Employees who have completed three months of service (and are over the age of 21) are eligible to participate in the 401(k) plan. Employees may enter the plan on the first of the month after eligibility.  Employees may choose either a traditional 401(k) account or a Roth 401(k) account.  Employees who elect to participate in the traditional plan may defer up to 100% of their compensation on a pre-tax basis.  The limit (as of 2018) is $18,500 in one calendar year for participants under the age of 50.  If the employee is 50 years or older, they may elect to defer an additional $6,000 for the calendar year, for a maximum of $24,500.

127.    Employees who elect to participate in the Roth 401(k) program may elect to defer up to 100% of their compensation on a post-tax basis.  The limit (as of 2018) is $18,000 in one calendar year for participants under the age of 50.  If the employee is 50 years or older, they may elect to defer an additional $6,000 for the calendar year, for a maximum of $24,000. Adjusted gross income limits as set forth for Roth IRA accounts do not apply for the Roth 401(k).  Regarding vesting for both plans, the Debtor can make a matching contribution of $0.50 on every $1.00 contributed by an employee up to 6.0% of an Employee's annual salary.  This matching contribution is determined by the Debtor's Board of Directors which reserves the right to change it at any time. Employee contributions are vested immediately at 100%.  Debtor contributions, however, are subject to the following vesting schedule (vesting starts from the date of hire, where one (1) year vesting is equal to 1,000 hours per year): 25% after one (1) year of service; 50% after two (2) years of service; 75% after three (3) years of service; and 100% after four (4) years of service.  The plan is administered by Nationwide Insurance, and the Debtor pays a quarterly fee of $1,000.  The Debtor remits payment for the plan to Nationwide Insurance

on a twice- monthly basis in line with the Debtor's pay cycle. The Debtor's average twice-monthly payment for the plan is approximately $84,000. As of the Petition Date, the Debtor does not owe any amounts for the plan.

### Debtor's Independent Contractor Obligations

128.    In addition to its Employees, the Debtor relies on services from 21 independent contractors (the "Independent Contractors") and a contractor provided by an employment agency (the "Agency Contractor") (together, the "Contractors").[6]

129.    The Independent Contractors are individual service providers that, for the most part, receive a 1099 and have a SSN for their tax ID. They are also known as temporary employees or "temps" and provide usual and customary business service in support of the Debtor for a limited period of time (no longer than twelve (12) months).  The Independent Contractors perform work in absence of an Employee (such as covering a leave of absence), during a temporary period of vacancy, and/or during period of increased work volume or other similar business necessity. They may work onsite or offsite and may be converted to an Employee at the Debtor's discretion.

130.    The Debtor retains the Agency Contractor through an employment agency (the "Agency") to provide temporary support needed.  The Agency bills the Debtor for work provided by the Agency Contractor and charges fees as an addition to each worker's applicable hourly rate.  The Debtor remits compensation to the Agency on account of the Agency Contractor's services upon services rendered.

---

[6] The Debtor is contracted with Syneos Health (formerly inVentiv) for 50 salespeople. This contracted sales organization ("CSO") is paid monthly and also is paid incentive compensation five months in arrears.

131.    As of the Petition Date, the Debtor estimates it may owe the Independent Contractors $330,000 in the aggregate for prepetition services provided. As of the Petition Date, the Debtor estimates it may owe the Agency approximately $15,000 in the aggregate for prepetition services provided by the Agency Contractor. The Debtor therefore seeks the authority, but not the direction, to pay $345,000 on account of prepetition Contract-related Obligations in the interim period.  The Debtor believes it is necessary to pay the obligations owed to the Contractors so that they will continue to assist with the Debtor's staffing needs as needed.

**D.      Motions for Payment of Other Critical Business Expenditures**

<u>Insurance</u>

132.    In the ordinary course of its business, the Debtor maintains an insurance program (the "<u>Insurance Program</u>") that provides coverage for, among other things: commercial general liability; property and casualty; automobile liability; employers responsibility; accidental death and dismemberment; commercial property; international operations; crime and theft; directors, officers, and organizational liability; insurance company professional liability; workers compensation; and umbrella liability (collectively, the "<u>Policies</u>").

133.    The Policies are essential to the preservation of the value of the Debtor's business, property and assets. Not only are some of the Policies required by various regulations, laws, and contracts that govern the Debtor's commercial activities, but I have also been advised by counsel that section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.

134.    Moreover, I have been advised by counsel that the Operating Guidelines for Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the

"U.S. Trustee Guidelines") require the Debtor to maintain insurance coverage throughout the pendency of the Chapter 11 Case.   For the policy period of 2017 to 2018, as of the Petition Date, the Debtor believes that it was substantially current on amounts owed under the Policies and the AFCO financing arrangement. Out of an abundance of caution, however, the Debtor seeks authorization to make payments attributable to the prepetition period (plus any unforeseen deductible payment amounts for prepetition claims). The Debtor seeks authorization to make monthly payments in accordance with the AFCO financing arrangement as each payment comes due. The payment is $76,000 per month.

135.    I believe that the coverage types, levels and premiums for these Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtor, and they are similar to businesses of comparable size and type to those of the Debtor.

136.    If the Debtor is unable to make any outstanding payments that may be owed on account of the Policies or AFCO financing arrangement, I have been advised by counsel that the Debtor's insurance providers (the "Insurance Providers") may seek relief from the automatic stay to terminate such Insurance Policies. If that were to happen, the Debtor would be required to obtain replacement insurance on an expedited basis and at a significant cost to the estates. If the Debtor is required to obtain replacement insurance, this payment would be likely greater than what the Debtor currently pays. Even if the Debtor's Insurance Providers were not permitted to terminate the agreements, it is my opinion that any interruption of payment would have a severe, adverse effect on the Debtor's ability to obtain future policies at reasonable rates.

137.    In light of the importance of maintaining insurance coverage with respect to its business activities and preserving liquidity by financing its insurance premiums, I believe it

is in the best interest of the Debtor's estates to receive Court approval to honor the Debtor's obligations under the Policies and AFCO financing and, as necessary, renew or enter into new such agreements.

138.    In sum, through the Insurance Motion, the Debtor requests entry of an order authorizing, but not directing, the Debtor (i) to continue to pay monthly financing payments to AFCO and (ii) renewing or replacing insurance arrangements in the ordinary course of business without further order of the Court and (iii) related relief.  Though the Debtor believes that it does not owe any prepetition Policy premiums or other obligations on the Policies, the Debtor also requests, out of an abundance of caution, permission to make all payments required to continue its Insurance Program, including payment of any prepetition premiums, deductibles, or other obligations under the Policies and, to the extent applicable, engage and pay insurance brokers in the ordinary course of business. The Debtor wishes to pay the appropriate parties up to $250,000, and $100,000 on an interim basis, to be allocated at the Debtor's discretion without prejudice to seek additional relief on an emergency basis.  Further, if the Court grants the relief sought in the Insurance Motion, the Debtor requests that all applicable banks and other financial institutions be authorized, when requested by the Debtor in its discretion, without any duty of inquiry or liability to any party for following the Debtor's instructions, to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts to pay amounts owed under the Insurance Program, whether those checks are presented prior to or after the Petition Date, and to make other transfers, provided that sufficient funds are available in the applicable accounts to make the payments.

139.    I believe that all of the relief requested in the Insurance Motion is in the best interest of the Debtor, its estates, creditors and other parties in interest. I also believe that all

of the relief requested in the Insurance Motion is necessary to preserve and enhance the value of the Debtor's estate for the benefit of all creditors, and that absent the relief sought in the Insurance Motion, a failure to pay any Insurance Obligations or to permit the Debtor to renew, revise, extend, supplement, change or enter into new insurance policies, as needed in its business judgment, will immediately threaten the continued operation of the Debtor and, consequently, the Debtor's estates. Therefore, it is my opinion that the potential harm and economic disadvantage that would stem from the cancellation of the Insurance Policies, and failure to renew the Insurance Policies or revise, extend, supplement, change or enter into new insurance arrangements as needed in its business judgment, are grossly disproportionate to the amount of the Insurance Obligations, and the costs to renew, revise, extend, supplement, change or enter into new insurance coverage.

Taxes

140.    The Debtor incurs taxes in the ordinary course of business, primarily comprising of income (federal and state), state franchise taxes, and property taxes on owned and leased property (the "Taxes"). Additionally, the Debtor is currently the subject of an audit of its 2015 income tax returns by the Internal Revenue Service (the "IRS Audit").

141.    In the most recently concluded calendar year, the Debtor incurred approximately $337,000 in tax liabilities payable to various authorities. As of the Petition Date, the Debtor estimates that it is required to remit approximately $42,000 in prepetition taxes, of which approximately $2,000 is estimated to fall due within 30 days of the Petition Date.

142.    In addition to Taxes, the Debtor incurs business license, compliance and regulatory fees and other similar assessments (the "Assessments"). Laws and regulations in jurisdictions in which the Debtor operates require the Debtor to pay fees to obtain a range of business licenses and permits from a number of different authorities. The methods for

calculating amounts due for such licenses and permits, and the deadlines for paying such amounts, vary by jurisdiction.

143.   In the most recently concluded fiscal year, the Debtor incurred approximately $340,000 in fee liabilities payable to various authorities.   As of the Petition Date, the Debtor estimates that they are required to remit approximately $5,000 in prepetition Assessments, of which approximately $2,000 are estimated to fall due within 30 days of the Petition Date.

144.   It is my belief that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtor's estate, thereby promoting its prospects for maximizing the value of its estate. If such obligations are not timely paid, it is my understanding that the Debtor will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws. The Debtor desires to avoid unnecessary disputes with the Taxing Authorities and expenditures of time and money resulting from such disputes over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes. Accordingly, I believe that the Debtor could suffer irreparable harm if the prepetition Taxes are not paid when they become due and payable.

145.   Additionally, the Taxing Authorities may cause the Debtor to be audited if Taxes are not paid immediately. Such audits will unnecessarily divert the Debtor's attention away from its efforts to maximize value, including the conduct of its business and the sale process. If the Debtor does not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtor's licenses, suspend the Debtor's operations and pursue other

remedies that will harm the estates. In all cases, the Debtor's failure to pay Taxes could have a material adverse impact on its ability to operate in the ordinary course of business.

146.    I have also been advised that the federal government and many states in which the Debtor operates have laws providing that the Debtor's officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes. In such event, collection efforts by the Taxing Authorities would be extremely distracting for the Debtor and its directors and officers in its efforts to bring the Chapter 11 Case to an expeditious conclusion.

Customer Programs

147.    The Debtor's customers are mainly wholesalers (the "Wholesalers"), who sell the Debtor's products primarily to retail drug stores in the U.S. In addition, the Wholesalers sell the Debtor's product to hospitals and clinic patients of the U.S. Department of Veterans Affairs (the "DVA"), the U.S. Department of Defense (the "DOD"), Indian Health Services ("IHS"), 340B Covered Entities (defined below), and recipients of Medicaid benefits, including State Pharmaceutical Assistance Programs ("SPAPs"), that each receive Contrave® at a reduced price.   The Debtor also sells product at a discount directly to certain Customers including specialty distributors, direct retail accounts and pharmacies (the "Specialty Distributors"). The Debtor's financial support programs are each designed to help offset the costs of Contrave®.   In addition, the cost to the patient of the Debtor's products is subsidized by private insurance plans via managed care organizations ("MCOs") and prescription benefit managers ("PBMs") with which the Debtor has special pricing arrangements.   Further, the Debtor's products are currently covered under Medicaid and are available to authorized users of the General Services Administration's Federal Supply Schedule ("Federal Supply Schedule"), including SPAPs, the DVA, the DOD, IHS, the Coast Guard and the Public Health Service (collectively, the

54

"Governmental Entities" and  together with Wholesalers and MCOs, and PBMs, the "Customers").

148.    Through the Customer Programs, the Debtor provides, among other things, (a) discounted rates on the Debtor's product for purchases made by patients covered by health insurance; and, (b) discounted rates on the Debtor's product related to patients eligible for certain federal and State government programs.  The Debtor's Customer Programs are common and typical of those in the pharmaceutical industry, critical to the Debtor's ability to serve its Customers and essential to the Debtor's business and growth.   During fiscal year 2017, approximately ninety-six percent (96%) of the Debtor's unit sales ultimately went to patients who received the Debtor's product pursuant to a Customer Program.   Approximately four percent (4%) of the patients who received one of the Debtor's products received it from Specialty Distributor sales channels that are not part of these Customer Programs and, consequently, are not subject to the relief sought in this Motion.

149.    Therefore, the success and viability of the Debtor's business, and ultimately the Debtor's ability to preserve and maximize value for creditors through this Chapter 11 Case, including the sale process, are fundamentally dependent upon the continuation of the Customer Programs and honoring the Debtor's obligations thereunder.  Maintaining ordinary course relationships with Customers is integral to preserving the value of the business.  The Debtor submits that any value-maximizing outcome to this Chapter 11 Case will, of necessity, involve the Debtor being able to continue its ordinary course operations and, thus, the Customer Programs.

150.    Through the Customer Programs, the Debtor provides, among other things, (a) discounts on the products for the DVA, the DOD, IHS, 340B Covered Entities

(defined below) and Specialty Distributors; (b) Medicaid (including SPAPs) Rebates; (c) rebates to supplement employer and patient costs via MCOs and PBMs; and (d) a return policy on purchases of the product.  The Debtor's Customer Programs are common and typical of those in the pharmaceutical industry.  Therefore, if the Debtor is to stay competitive, it is critical that the Debtor be authorized to continue the Customer Programs and honor prepetition obligations associated with the Customer Programs.  The following are general descriptions of the Debtor's principal Customer Programs.

### A.  Customer Discounts via Wholesalers and MCOs/PBMs

151.    The Debtor has contracts with Wholesalers to sell its product at wholesale acquisition cost ("WAC"), which is the base price determined by the Debtor in its sole discretion and adjusted from time to time.  The contracts with Wholesalers provide for industry-standard discounts, such as the "prompt pay" discount, which affords a two percent (2%) discount to Wholesalers for paying their invoice within the payment terms of the contract.  Further, the Wholesalers charge the Debtor fees for handling its products and processing retail channel orders as well as for product returns ("Wholesaler Fees").  These fees and returns are normally taken as credits against future payments by the Wholesalers to the Debtor; however, a limited portion of Wholesalers prefer their Wholesaler Fees to be paid by check instead of taken as credits against future payments.  Those Wholesalers who prefer to be paid by check represent less than 1% of the total Wholesaler Fees paid by the Debtor annually.  Similar to the Wholesaler payment timing noted above, any prepetition balance owing to these Wholesalers paid by check could be setoff against prepetition balances owing from these Wholesalers to the Debtor.

152.    With respect to MCOs/PBMs, the Debtor enters into agreements with MCOs and PBMs to gain access to patients covered by insurance and establish a formulary position for its product within the MCOs/PBMs network of coverage.  MCOs and PBMs submit

Rebate claims to the Debtor based on agreed upon Rebate percentages between the MCO/PBM and the Debtor and volume of claims. MCOs/PBMs remit invoices and claim level detail to the Debtor for their Rebate claims either monthly or quarterly, depending on their arrangement with the Debtor. Absent approval to continue making the Rebates to MCOs and PBMs there is a potential risk that they will attempt to reduce Contrave®'s tier of coverage or remove it from the formulary entirely, which would result in an inability to access a substantial market of covered patients and offer those covered patients the ability to participate in the discount programs likely resulting in significantly reduced prescriptions and ultimately revenue. For the avoidance of doubt, the Debtor does not intend to pay any prepetition amounts owed to any MCOs or PBMs who reduce the Debtor's tier of coverage.

153. Thus, (as described in more detail below), if the Debtor has contracted with certain Customers that acquire the product, or subsidize the price to the patient, for a lower agreed upon contract price than the WAC, then either (i) the Wholesaler will receive payment for the product from particular Government Entities at the lower contracted price, and the Wholesaler will chargeback the Debtor for the price difference to the WAC price originally paid ("Chargebacks") or, (ii) in the case of patients that utilize insurance, the MCOs, or PBMs, will receive a rebate from the Debtor for formulary placement ("Rebates").[7] These price differences are resolved through (i) credits for Chargebacks attributed to such Wholesaler in the Debtor's accounts receivable system and are applied against subsequent payments for product made by the Wholesaler, or (ii) Rebates paid to such MCOs/PBMs based on claims generated by patients using insurance (collectively, the "Discount Programs").

---

[7] Formulary placement allows the Debtor better positioning of the product within the organizations covered by the MCOs/PBMs, effectively increasing access to the Debtor's product.

154.    Given that Wholesalers continue to owe the Debtor for subsequent product purchases, they will simply reduce their next payment to the Debtor for the Chargebacks they've incurred. Further, because purchases and Chargebacks happen through the accounts receivable system on a daily basis, it is difficult for the Debtor to determine with precision the actual amount of outstanding Chargebacks at any particular time.  These Chargebacks generally do not result in an actual payment of cash to the Wholesaler except for the less than 1% noted previously who prefer to be paid by check, or in other rare circumstances, such as where the Debtor is ending its relationship with a particular Wholesaler and the amount of the Chargeback has not yet been fully applied against subsequent orders.  This same mechanism of setoff applies for Wholesaler Fees and Returns (discussed below).

155.    By offering customary prompt pay discounts and Wholesaler Fees to Wholesalers, the Debtor is able to incentivize the Wholesalers to enter into contracts with the Debtor.  In addition, allowing Wholesalers to set off prompt pay discounts, Wholesaler Fees, Chargebacks and Returns against amounts owing to the Debtor is a customary practice in the pharmaceutical industry.  The Debtor believes that the failure to continue to allow the Wholesalers to purchase the product with the customary prompt pay discounts and Wholesaler Fees, or to allow for continued set off of prompt pay discounts, Wholesaler Fees, Chargebacks, and Returns against amounts owing to the Debtor, will result in such Customers ceasing to (a) enter into purchase agreements with the Debtor or (b) purchase the Debtor's product. Any interruption in purchases by Wholesalers will likely have a devastating impact on the Debtor's ability to continue to sell its product and be detrimental to its revenue stream.

156.    In sum, the Debtor seeks authority to continue the Discount Programs in the ordinary course of business.  The Debtor's average monthly liabilities for the Discount

Programs are as follows: (i) Wholesaler Fees of approximately $1.0 million, (ii) Chargebacks to Wholesalers of approximately $400,000 and (iii) Rebate claims to MCOs/PBMs of approximately $900,000.  The Debtor estimates that as of the Petition Date, (i) approximately $2.2 million is outstanding for prepetition Wholesaler Fees with approximately $1.3 million due in the interim period, (ii) 400,000 is outstanding for prepetition Chargeback claims with the entirety due in the interim period, and (iii) with respect to Rebate claims from MCOs/PBMs, approximately $2.6 million in outstanding prepetition Rebates with approximately $850,000 due in the interim period. The Debtor seeks the authority, but not the direction, to allow Wholesalers to continue to setoff Wholesaler Fees and Chargebacks against the Debtor's accounts receivable in the ordinary course and pursuant to prepetition customary terms between the Debtor and Wholesalers, and to pay Rebate claims to MCOs and PBMs when they become due in the ordinary course of business.

### B.  Government Programs

157.    The Medicaid Drug Rebate Program ("MDRP") is a health program that includes the Centers for Medicare & Medicaid Services ("CMS"), State Medicaid Agencies, and participating drug manufacturers to help offset the Federal and State costs of most outpatient prescription drugs dispensed to Medicaid patients.  In order to participate in MDRP, the Debtor is required to enter into agreements with two other Federal programs in order to have their drugs covered under Medicaid: A pricing agreement for the 340B Drug Pricing Program (the "340B Program") and a master agreement with the Secretary of Veterans Affairs for the Federal Supply Schedule.  Each of these programs requires the Debtor to sell Contrave® at a substantial discount to WAC to the applicable Customers.  In addition to MDRP, the Debtor also participates in SPAPs, which are intended to aid low-income elderly or persons with disabilities who do not qualify for MDRP.

158.  **Federal Supply Schedule.**  The Federal Supply Schedule collectively includes the Governmental Entities, and provides the maximum amount that can be charged to these Governmental Entities for pharmaceuticals based on a specific mandated formula set annually.  The Debtor was awarded a Federal Supply Schedule contract (the "FSS Contract") in exchange for the Debtor providing federally mandated pricing to the Governmental Entities. Participants under the Federal Supply Schedule place orders for the product through Wholesalers who purchase the product from the Debtor and then ship the product directly to the hospitals and clinics.  In accordance with the Federal Supply Schedule, in 2018, the Debtor charged member patients $154.39 per 120ct bottle of Contrave®, a discount of approximately thirty-six percent (36%) to the Debtor's current WAC price of $241.73 per 120ct bottle.[8]  If the price of the product offered through the FSS Contract is lower than the WAC price, the Wholesaler will Chargeback the Debtor for the difference.  The Debtor expects that the Contrave® discount will remain the same or increase in the future, contingent on price changes.

159.  The Debtor seeks authority to continue operating pursuant to the FSS Contract in the ordinary course of business.  The Debtor's average monthly liability for Chargebacks related to the FSS Contract is approximately $10,000, though Chargebacks and purchases are reconciled through the Debtor's accounts receivable and do not generally result in cash payment.  The Debtor seeks authority to allow Wholesalers to continue to setoff Chargebacks related to the FSS Contract against the Debtor's accounts receivable in the ordinary course of business.

---

[8]  The 2018 Federal Supply Schedule price includes The Industrial Funding Fee ("IFF"), a fee that is required to be added to a Federal Supply Schedule price to reimburse the VA National Acquisition Center for the costs incurred in operating the Federal Supply Schedule program.  The IFF applicable to the VA FSS contract is 0.5 percent (0.5%) of total sales related to the Federal Supply Schedule program.  The IFF payment is due 60 days following the end of each reporting quarter.

160.    **340B Covered Entities.** Certain hospitals and health care facilities (the "340B Covered Entities") provide the majority of their services to low income patients and receive payments from CMS to cover the costs of providing care to uninsured patients. Pursuant to the 340B Program, the Debtor provides its product to 340B Covered Entities at a discounted price set by statute, which is calculated on a quarterly basis. 340B Covered Entities submit a request for the product to one of the Debtor's Wholesalers and the Wholesaler fulfills that request and then submits a Chargeback to the Debtor for the difference between the price that the Wholesaler paid and the discounted price that the 340B Covered Entities paid for the product.

161.    The Debtor's average monthly liability for Chargebacks related to the 340B Program is approximately $390,000, but Chargebacks and purchases are reconciled through the Debtor's accounts receivable and do not generally result in a cash payment. By this Motion, the Debtor seeks authority to continue the 340B Program in the ordinary course of business and to apply any prepetition Chargebacks that may be outstanding against prepetition accounts receivable and, if necessary, against subsequent orders of the Debtor's products in the ordinary course of business.

162.    **Medicaid Rebates.** MDRP covers certain outpatient drugs, including the Debtor's product, and requires the Debtor to enter into a national rebate agreement with the Secretary of the Department of Health and Human Services in exchange for Medicaid coverage of its product. The Debtor's Wholesalers provide the product to a retail pharmacy to be utilized by a Medicaid patient. Individual states collect product utilization data on the use of the product and send the Debtor a report and invoice. The Debtor is then responsible for paying a rebate ("Medicaid Rebate") on the product for each time that the product was dispensed to Medicaid patients. The amount of the Medicaid Rebate due for each unit of the individual

product is based on a statutory formula.  The Debtor pays the Medicaid Rebates to each State MDRP or SPAP on a quarterly basis, and the amount is  shared between the states and the federal government to offset the overall cost of the prescription drugs under the Medicaid program. As of the Petition Date, the Debtor estimates that approximately $250,000 has been accrued but has not been invoiced for Medicaid Rebates with approximately $150,000 due in the interim period. While this amount is not yet due and payable, it may become due and payable  over the course of this Chapter 11 Case.

163.    The Debtor's participation in the FSS Contract and the 340B Program requires the Debtor to participate in the MDRP and pay Medicaid Rebates.  As a result, if the Debtor fails to fulfill its obligations under the MDRP, including payment of the Medicaid Rebates as they become due, it risks becoming excluded from all federal programs.  As such, honoring Medicaid Rebates is integral to the Debtor's business, and the Debtor cannot risk the substantial harm that could arise from the failure to pay the Medicaid Rebates, including denial of coverage and damage to the Debtor's relationship with its Customers.  Such a result would irreparably impair the Debtor's efforts to conduct its business during this Chapter 11 Case and maximize value.  Consequently, the Debtor requests authorization to continue to make Medicaid Rebates pursuant to the MDRP and SPAPs during this Chapter 11 Case as related to both prepetition and postpetition sales of its products.

164.    In addition, as noted above, the Debtor offers mandated price discounts as part of the FSS Contract and the 340B Program. These price discounts are honored by Wholesalers who, in turn, Chargeback the price difference between the discounted price and the WAC back to the Debtor.  These Chargebacks are normally taken as credits against future payments by the Wholesalers to the Debtor.  Thus, there will be prepetition amounts for these

Chargebacks, which are going to be setoff against payments of prepetition receivables. The Debtor estimates the total prepetition Chargebacks at approximately $400,000, which would be entirely setoff against the Debtor's prepetition accounts receivables and all in the interim period.

### C.  Sales Return Program

165.    In the ordinary course of business, the Debtor's Customers may be unable to sell products it purchased from the Debtor because the product expires, the product is damaged and unsellable, there is a drop in demand, or for some other reason. Accordingly, the Debtor allows its Customers to return the expired and damaged products (a "<u>Return</u>") to the Wholesalers in exchange for credit within a limited time before and after the date of expiration (the "<u>Sales Return Program</u>"). Purchasers of Contrave® may return the expired product within six (6) months prior to and twelve (12) months after the expiration date, and may return damaged goods if the Debtor is notified of the damaged goods within five days of receipt of the damaged goods. Credits are then issued by the Debtor to the Wholesaler based on its purchase history and can be used to offset any amounts the Wholesaler owes the Debtor.

166.    As of the Petition Date, the Debtor estimates that there is approximately $70,000 in potential Returns of the Debtor's product, which would be setoff against the Debtor's prepetition accounts receivable entirely in the interim period. To maintain its Customers' goodwill and continued business, the Debtor seeks authorization to honor any prepetition Return requests and obligations under the Sales Return Program that occur postpetition in the ordinary course of business.

167.    The ability of the Debtor to maximize the value of its business and its inventory is dependent on continuing the Customer Programs. Any delay in honoring the Debtor's obligations thereunder could severely disrupt the Debtor's efforts to maximize its value.

Any failure to honor prepetition Customer obligations, even for a brief period of time, may drive away valuable Customers, thereby harming the Debtor's efforts to maximize the value of its inventory.  Accordingly, the Debtor seeks authorization to continue the Customer Programs.

### D.  Managed Services Operations

168.    The Debtor utilizes CIS by Deloitte ("CIS") to provide managed services operations that include government price calculations, Medicaid and SPAPs claim validation and processing, MCO and PBM claim validation and processing, contract administration, and dispute resolution.  Once Rebates or Medicaid Rebates have been validated and processed, CIS makes a funding request to the Debtor sufficient to fund payments to Medicaid, SPAPs, MCOs and PBMs, as applicable, in accordance with their terms of payment.  As of the Petition Date, there is approximately $650,000 of outstanding funding requests from CIS pertaining to Rebates due (these amounts are already reflected in the prepetition balances for Rebates noted above). CIS provides these ongoing services daily and such services are an integral part of the Debtor's management of access to a significant segment of its target market.  As of the Petition Date, there is approximately $100,000 accrued and outstanding from CIS pertaining to its services with $50,000 due in the interim period. Any interruption in CIS's services will likely have a devastating impact on the Debtor's ability to continue to sell its product and be detrimental to its revenue stream.  Therefore, the Debtor seeks permission to continue paying CIS its service fees in the ordinary course, including any service fees that may have arose prepetition.

### Utilities

169.    In connection with its business operations, the Debtor obtains electricity, natural gas, and telephone and telecommunication services (collectively, the "Utility Services") through approximately seven accounts that it has with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers").  The Debtor has

filed a motion requesting that the Court approve the Debtor's proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in Bankruptcy Code section 366, approving procedures for resolving any objections by the Utility Providers relating to the Proposed Adequate Assurance and prohibiting the Utility Providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtor.

170.    I believe that any interruption in Utility Services, even for a brief period of time, would cause the Debtor to no longer be able to operate its business and the Debtor could suffer irreparable harm.  Such an interruption would undoubtedly impede the Debtor's efforts to maximize the value of its business.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Case. I believe that the procedures the Debtor has proposed for the Utility Providers adequately protect the rights that I have been advised are provided to the Utility Providers under the Bankruptcy Code, while also protecting the Debtor's need to continue to receive, for the benefit of its estate, the Utility Services upon which its business depends on.

<u>Critical Vendors</u>

171.    The Debtor continues to do business with vendors whose goods and services are essential to the Debtor's operations (the "Critical Vendors"). By this Motion, the Debtor seeks entry of an order granting it authority to make payments on account of the prepetition claims of the Critical Vendors (the "Critical Vendor Claims"), not to exceed an aggregate amount of $1,000,000 on an interim basis and $1,500,000 on a final basis (for both interim and final periods, the "Critical Vendor Claims Cap").

172.    The Debtor has categorized its Critical Vendors into three subsets for purposes of this Motion and seeks different interim and final caps on payments to such categories of Critical Vendors on account of their prepetition claims.  First, the Debtor has

Critical Vendors on account of manufacturing, supply and service provider arrangements with the Debtor (the "Critical Supply and Service Vendors"). The Debtor is seeking authority to pay such Critical Supply and Service Vendors up to $600,000, and $300,000 on an interim basis. Second, the Debtor has Critical Vendors that are owed approximately $600,000 on account of certain warehousing and freight arrangements with the Debtor (the "Critical Warehouse and Freight Vendors"). The Debtor wishes to pay such Critical Warehouse and Freight Vendors up to $600,000, and $500,000 on an interim basis.  Third, the Debtor has Critical Vendors that are foreign suppliers of goods and services that are owed approximately $300,000 on account of goods and services provided to the Debtor (the "Critical Foreign Vendors").  The Debtor wishes to pay such Critical Foreign Vendors up to $300,000 and $200,000 on an interim basis.

173.    The Debtor seeks the authority to pay, in its sole discretion and business judgment, all or a portion of the Critical Vendor Claims.  The Debtor estimates the maximum amount needed to pay the Critical Vendor Claims is the amount of the Critical Vendor Claims Cap.  Of this amount, the Debtor estimates the maximum amount needed to pay Critical Vendor Claims before the final hearing is $1,000,000.  The Critical Vendor Claims Cap represents the Debtor's best estimate as to how much must be paid to such creditors to continue an uninterrupted supply of critical goods and services. The Debtor may pay less than the requested amount. The Debtor further requests that the Court grant the Debtor the authority to allocate the forgoing amounts at the Debtor's discretion without prejudice to seek additional relief on an emergency basis, and subject to an agreement to receive terms consistent with Customary Trade Terms (as defined herein) from the Critical Vendors.

174.    In an exercise of business judgment, the Debtor has determined that continuing to receive specialized goods and services from the Critical Vendor Claimants is

necessary to operate and restructure its business as a going concern and to maximize value. If granted discretion to satisfy Critical Vendor Claims, as requested in the Critical Vendor Motion, the Debtor will assess, case by case and in real time the benefits to the estate of paying Critical Vendor Claims and pay such claim only to the extent the estate will benefit. Without this relief, the Debtor believes that the Critical Vendor Claimants would cease providing goods and services to the Debtor or otherwise take action to impede the Debtor's restructuring – a dire result for the Debtor and its stakeholders.

175.    The Debtor believes that most of its vendors will continue to do business with the Debtor after commencement of this Chapter 11 Case because doing so simply makes good business sense.  I, however, anticipate that certain vendors that supply goods or services that are necessary to the Debtor's business will: (a) refuse to deliver goods and services without payment of its prepetition claims; (b) refuse to deliver goods and services on reasonable credit terms absent payment of prepetition claims, thereby requiring the Debtor to use even greater liquidity and increase its operating costs; or (c) suffer significant financial hardship, such that the Debtor's non-payment of its prepetition claims could have a significant negative impact on a Critical Vendor's business and therefore its ability to supply the Debtor with needed goods and services.

176.    Accordingly, the Debtor requests the Court's authority to pay the prepetition Critical Vendor Claims because payment of such claims is necessary to an effective businesses, the Debtor used the following criteria: (a) whether the vendor in question is a "sole source" provider; (b) whether quality requirements or other specifications prevent the Debtor from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; (c) whether a vendor meeting the standards of (a) or (b) is likely to refuse to ship

product to the Debtor postpetition if its prepetition balances are not paid; (d) whether a vendor would suffer significant financial hardship absent the Debtor's payment of prepetition claims; (e) the degree to which replacement costs (including, pricing, transition expenses, professional fees and lost sales of future revenue) exceed the amount of a vendor's prepetition claim; (f) whether an agreement exists by which the Debtor could compel a vendor to continue performing on prepetition terms; and (g) for foreign vendors specifically, whether the vendor lacks minimum contacts with the United States such that the vendor may not be subject to the jurisdiction of this Court or the provisions of the Bankruptcy Code that otherwise protect the Debtor's assets and business operations, or may simply be confused by the chapter 11 process.

177.    I am confident that this process has appropriately identified only those vendors that meet some or all of the foregoing stringent guidelines and that, if the Debtor failed to pay for the vital goods and services it provided prepetition, would likely cease to provide them in the future. It is my opinion that the cessation of such goods or services would adversely impact the Debtor's ability to reorganize, and any efforts to replace such good or services would distract the Debtor from the chapter 11 process more generally, at the expense of the Debtor's creditors and other parties in interest.

[*remainder of page intentionally left blank; signature page to follow*]

I declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code that the foregoing is true and correct to the best of my knowledge.

Dated: _____March 12_____, 2018

_____
Michael A. Narachi
President and CEO