## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| **Orexigen Therapeutics, Inc.**, | Case No. 18-10518 (___) |
| Debtor.[1] | |

## MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR TRANSFERS OF EQUITY SECURITIES AND (II) ESTABLISHING A RECORD DATE FOR NOTICE AND SELL-DOWN PROCEDURES FOR TRADING IN CLAIMS AGAINST THE DEBTOR'S ESTATE

The debtor and debtor-in-possession in the above-captioned case (the "Debtor") hereby moves the Court (the "Motion") for the entry of interim and final orders pursuant to sections 105, 362 and 541 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i) establishing notice and objection procedures regarding certain transfers of beneficial interests in equity securities of the Debtor (collectively, the "Equity Securities"); (ii) establishing a record date (the "Record Date") for notice and potential sell-down procedures for trading in claims against the Debtor ("Claims"); and (iii) granting certain related relief. In support of this motion, the Debtor incorporates the statements contained in the *Declaration of Michael A. Narachi in Support of First Day Relief* (the "First Day Declaration") filed contemporaneously herewith, and respectfully submits as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 8822. The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA, 92037.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief requested herein are sections 105, 362 and 541 of the Bankruptcy Code and Rules 3001 and 6003(b) of the Bankruptcy Rules.

**Background**

3.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (this "Chapter 11 Case").  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner and no committee has been appointed in this Chapter 11 Case.

4.      The Debtor is a biopharmaceutical company focused on the treatment of obesity and the commercialization of a single pharmaceutical drug for chronic weight management. Orexigen was a publicly traded company with its shares listed on The NASDAQ Stock Market under the ticker symbol "OREX".  It is expected that upon the filing of this Chapter 11 Case, NASDAQ will suspend trading in the Debtor's Equity Securities; however, such securities may still be traded in the over-the-counter market.  As of December 31, 2017, there were 18,887,033 shares of Orexigen common stock issued and outstanding and 219,994 shares of Series Z Preferred Stock issued and outstanding. Additional details regarding the

Debtor's business and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration.

### The Debtor's Net Operating Losses

5.    As described in more detail in the First Day Declaration, the Debtor has experienced losses from the operation of its business, having failed to post positive net earnings since its inception.  As a result, the Debtor estimates that its utilizable federal income tax net operating losses are approximately $350 million to $400 million ("NOLs"), consisting of approximately $200 million of NOLs through 2016 and $150 million to $200 million of NOLs generated during 2017, and it expects to have incurred additional NOLs since then through the Petition Date, which amounts could be even higher when the Debtor emerges from chapter 11. Assuming utilizable NOLs of $300 million, for example, this would translate into future reductions of the Debtor's federal income tax liabilities of approximately $63,000,000 based on a corporate federal income tax rate of 21%.  These tax savings could substantially enhance the Debtor's cash position for the benefit of parties in interest and contribute to the Debtor's efforts to maximize value for the benefit of creditors.

6.    As described more fully below, the Debtor may lose the ability to use its NOLs if it experiences another "ownership change" for federal income tax purposes.  To prevent this potential loss of property of the Debtor's estate, the Debtor requests Court approval of the procedures detailed herein to govern the transfers of Equity Securities during the pendency of this Chapter 11 Case.  In addition, the Debtor may ultimately seek an order with respect to trading in Claims (a "Sell-Down Order") to protect and preserve the value of the NOLs in

connection with a chapter 11 plan of reorganization or other qualifying transaction, and this

Motion is designed to give advance notice of such possibility.[2]

**Potential Limitations on the Use of the Debtor's NOLs**

7.      Section 172 of the Internal Revenue Code of 1986 (as amended, the

"IRC") permits corporate taxpayers to carry forward NOLs generated through December 31,

2017 for up to 20 subsequent tax years to offset future income in years following the years in

which they were incurred, thereby reducing their federal income tax liability on such future

income and significantly improving their cash position.  For NOLs generated subsequent to

January 1, 2018, the carryforward period is unlimited.

**A.      Limitations on the Debtor's Ability to Use Its NOLs**

8.      However, the Debtor's ability to use its NOLs and certain other losses,

which will be referred to collectively herein as NOLs, is subject to certain statutory limitations.

Section 382 of the IRC limits the ability of a corporation to use its NOLs after an "ownership

change" occurs.  Generally, an "ownership change" occurs if the percentage (by value) of the

stock of the corporation owned by one or more 5% shareholders has increased by more than 50

percentage points over the lowest percentage of stock owned by such shareholders at any time

during the relevant testing period, which is usually the three-year period ending on the date of

the ownership change.[3]  For example, an ownership change would occur in the following

situation:

---

[2] To the extent the Debtor seeks entry of a Sell-Down Order, the Debtor will provide notice and the opportunity for a hearing.

[3] In general, under section 382(g)(4)(A) of the IRC, all shareholders who individually hold less than 5% of the stock of a company are deemed to be a single 5% shareholder throughout the three-year testing period, and transfers between such shareholders are disregarded for purposes of determining whether an ownership change has occurred.  Accordingly, the Debtor does not seek to impose the requested notice and objection procedures on Transfers among shareholders holding less than 4.5% of the Equity Securities, provided that such shareholders do not have an intent to accumulate a 5% or greater block of

Three individuals ("A," "B" and "C") each own 20% of the stock of corporation X ("X"). Each sells 15% to another individual ("D"), who has recently acquired 7%. Under section 382 of the IRC, an ownership change has occurred because D both became a 5% shareholder and increased his ownership in X by more than 50 percentage points (from 0% to 52%) during the testing period.

9.        When an ownership change occurs, the normally applicable rules of section 382 of the IRC limit a corporation's use of its "pre-change" NOLs against future taxable income in any taxable year (or a portion thereof) to an annual amount equal to (a) the value of its stock prior to the ownership change, multiplied by (b) the long-term, tax-exempt interest rate. *See* IRC § 382(b). For a distressed company especially, this limitation could severely restrict the use of NOLs because the value of its stock may be quite low. For example, if a hypothetical distressed corporation underwent an ownership change when its equity value was at a depressed value of $10 million, the annual limitation on the corporation's use of its NOLs resulting from that ownership change would be $274,000 (based on a 2.74% long-term, tax-exempt rate that would apply under section 382 of the IRC for an ownership change). In other words, the company would be able to utilize only $274,000 of its NOLs in each post-change tax year. Taxable income in excess of this amount would be taxable to the company at the federal rate of 21%.

10.        If left unrestricted, transfers of Equity Securities during the pendency of this Chapter 11 Case could severely limit the Debtor's ability to use its NOLs, and could have significant negative consequences for the Debtor, its estate and its efforts to maximize value for creditors. Specifically, transfers of Equity Securities could adversely affect the Debtor's NOLs

---

stock or add or sell shares to or from such block. To allow for a prudent margin of error and in a good faith effort to avoid underestimating the threshold, the Debtor has calculated the threshold using 4.5% instead of 5%.

if (a) too many 5% or greater blocks of Equity Securities are created, or (b) too many Equity Securities are added to or sold from such blocks, such that, together with previous transfers by or to 5% shareholders during the preceding three year period (or shorter period where there has been a more recent ownership change), an ownership change within the meaning of section 382 of the IRC has occurred prior to consummation and outside the context of a confirmed chapter 11 plan.

11.    Thus, to preserve to the fullest extent possible the flexibility to pursue consummation of a plan of reorganization that maximizes the use of its NOLs, the Debtor seeks limited relief that will enable them to closely monitor certain Transfers (as defined in paragraph 18(i) below) of Equity Securities, and thereby put the Debtor in a position to act expeditiously to prevent or to limit such Transfers if necessary to preserve its NOLs.

**B.    Ownership Change in the Context of a Qualifying Bankruptcy Event**

12.    The limitations imposed by section 382 of the IRC are significantly relaxed if an ownership change occurs pursuant to a confirmed chapter 11 plan or a qualifying asset sale.  Under section 382(l)(5) of the IRC, a debtor corporation is not subject to the limitations imposed by section 382 of the IRC if (a) the ownership change resulted from consummation of a chapter 11 plan or a qualifying asset sale and (b) pursuant to the plan or a qualifying asset sale, the debtor's pre-change-in-ownership equity holders (i.e., persons or entities who owned the debtor's equity immediately before the relevant ownership change) and/or "Qualified Creditors" emerge from the reorganization owning at least 50% of the total value and voting power of the debtor's stock immediately after the ownership change (the "Section 382(l)(5) Safe Harbor").

13.    Under section 382(l)(5)(E) of the IRC and the regulations promulgated thereunder, a creditor whose claim is exchanged for stock of a debtor corporation under a plan of reorganization or pursuant to a qualifying sale is a "Qualified Creditor" for section 382 purposes if such claim either (a) has been owned by such creditor for 18 or more months prior to the date of filing of the bankruptcy petition, or (b) arose in the ordinary course of the debtor's business and was at all times beneficially owned by such creditor.  Creditors may also be "qualified," despite not satisfying the continuous ownership requirements under either (a) or (b) of the preceding sentence, if they meet the criteria set forth in the De Minimis Rule described below.

14.    For purposes of the Section 382(l)(5) Safe Harbor, under Treasury Regulation § 1.382-9(d)(3) (the "De Minimis Rule"), a debtor generally may "treat indebtedness as always having been owned by the beneficial owner of the indebtedness immediately before the ownership change if the beneficial owner is not, immediately after the ownership change, either a 5% shareholder or an entity through which a 5% shareholder owns an indirect ownership interest" in the debtor.  Such a claimholder will generally be a Qualified Creditor under the Section 382(l)(5) Safe Harbor unless the particular claim(s) that it holds both (a) did not arise in the ordinary course of the issuing debtor's business and (b) was not in existence 18 months prior to the filing of the bankruptcy petition.

15.    Alternatively, where an ownership change results from the consummation of a chapter 11 plan or qualifying asset sale but the requirements for the Section 382(l)(5) Safe Harbor are *not* met, section 382(b) of the IRC would limit the amount of taxable income that the debtor could offset with an NOL.

16.    Under the scenario where the requirements for the Section 382(l)(5) Safe Harbor are not met (or the debtor elects out of that provision), the annual section 382

limitation is calculated using the special rule of section 382(l)(6) of the IRC.  That rule provides that the value of the debtor, for purposes of calculating the section 382 limitation, generally must reflect any increase in value resulting from any surrender or cancellation of creditors' claims, as well as any new investments, pursuant to the plan.  As a result, assuming the debtor's value increases as a result of its chapter 11 plan or qualifying asset sale, the amount of taxable income that can be offset will still be limited—although not by as much as if the ownership change occurred outside the context of a confirmed chapter 11 plan or a qualifying asset sale (as described in paragraph 9 above).

17.    Therefore, to protect the Debtor's ability to maximize the use of its NOLs, pursuant to a confirmed chapter 11 plan or an approved asset sale, the Debtor may need to seek entry of a Sell-Down Order with respect to Claims allowing them to (a) determine whether the reorganized Debtor will qualify for and benefit from the Section 382(l)(5) Safe Harbor, and (b) require certain persons or entities that have acquired Claims during this Chapter 11 Case in an amount that would entitle such claimholders to receive more than 4.5% of the equity of the reorganized Debtor (collectively, the "Substantial Claimholders") to sell down its Claims to the extent necessary to allow the reorganized Debtor to qualify for the Section 382(l)(5) Safe Harbor (the "Sell-Down Procedures").[4]  This is in addition to the procedures governing Transfers of Equity Securities.

### The Proposed Equity Transfer Procedures

18.    By establishing procedures for monitoring the transfer of Equity Securities, the Debtor can preserve its ability to seek the necessary relief at the appropriate time if it appears that transfers of Equity Securities may jeopardize the Debtor's use of its NOLs.

---

[4] A summary of the potential Sell-Down Procedures is provided in paragraphs 23 through 29 below.

Therefore, the Debtor proposes the following notice and objection procedures for holding and transferring Equity Securities (the "Equity Transfer Procedures"):

i. Certain Defined Terms.  For purposes of this motion and the interim order and the final order sought hereunder:  (A) a "Substantial Equityholder" is any person or entity that beneficially owns at least (i) 849,916 shares (representing approximately 4.5% of the 18,887,033 issued and outstanding shares) of Orexigen Therapeutics, Inc. or (ii) 9,899 shares of Series Z Preferred Stock (representing approximately 4.5% of the 219,994 issued and outstanding shares) of Orexigen Therapeutics, Inc. (B) "beneficial ownership" of Equity Securities shall be determined in accordance with applicable rules under section 382 of the IRC and the regulations promulgated thereunder and shall include (i) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all equity owned or acquired by its subsidiaries), (ii) ownership by such holder's family members and persons acting in concert with such holder to make a coordinated acquisition of stock and (iii) ownership of options to acquire stock; (C) an "option" to acquire stock includes any contingent purchase, warrant, convertible debt, exchangeable shares, put, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently exercisable; and (D) a "Transfer" means any transfer of Equity Securities to the extent described in paragraph 18(iii) below (Equity Security Acquisition Notice) and/or paragraph 18(iv) below (Equity Security Disposition Notice).

ii. Notice of Substantial Equityholder Status.  Any person or entity who currently is or becomes a Substantial Equityholder shall (a) file with the Court and (b) serve upon (i) the Debtor, c/o Orexigen Therapeutics, Inc., 3344 North Torrey Pines Court, Suite 200, La Jolla, CA, 92037 (Attn: Tom Lynch), and (ii) proposed counsel to the Debtor, Hogan Lovells US LLP, 875 3rd Ave, New York, NY 10022 (Attn:  Christopher R. Donoho, III, Esq. and John D. Beck, Esq.), a notice of such status, in the form attached as Exhibit 2 to the interim order (a "Notice of Substantial Equityholder Status"), on or before the later of (A) 14 days after entry of the interim order or (B) 14 days after becoming a Substantial Equityholder.

iii. Equity Security Acquisition Notice.  At least 14 days prior to any transfer of Equity Securities (including any transfer of options to acquire equity or any exercise thereof) that would result in an increase in the amount of Equity Securities beneficially owned by a Substantial Equityholder or would result in a person or entity becoming a Substantial Equityholder, such Substantial Equityholder or potential Substantial Equityholder shall (a) file with the Court and (b) serve on the Debtor and counsel to the Debtor (at the addresses set forth in paragraph 18(ii) above), advance

written notice of the intended transfer of Equity Securities, in the form attached as <u>Exhibit 3</u> to the interim order (an "<u>Equity Security Acquisition Notice</u>").

iv.  <u>Equity Security Disposition Notice</u>.  Prior to any transfer of Equity Securities (including options) that would result in a <u>decrease</u> in the amount of Equity Securities beneficially owned by a Substantial Equityholder or would result in a person or entity <u>ceasing</u> to be a Substantial Equityholder, such Substantial Equityholder shall (a) file with the Court and (b) serve on the Debtor and counsel to the Debtor (at the addresses set forth in paragraph 18(ii) above), advance written notice of the intended transfer of Equity Securities, in the form attached as <u>Exhibit 4</u> to the interim order (an "<u>Equity Security Disposition Notice</u>").

v.  <u>Objection Procedures</u>.  The Debtor shall have 7 days after receipt of an Equity Security Acquisition Notice or an Equity Security Disposition Notice (each, a "<u>Transfer Notice</u>") to file with the Court and serve on the party filing the Transfer Notice an objection to the proposed Transfer on the grounds that such Transfer may adversely affect the Debtor's ability to utilize its NOLs.  If the Debtor files an objection, the proposed Transfer will not be effective unless and until approved by a final and nonappealable order of this Court.  If the Debtor does not object within such 7-day period, the Transfer may proceed solely as set forth in the Transfer Notice.  Further Transfers within the scope of this paragraph must comply with the Equity Transfer Procedures set forth in this paragraph 18(v).

vi.  <u>Unauthorized Transfers of Equity Securities</u>.  Effective as of the Petition Date and until further order of this Court to the contrary, any acquisition or disposition of Equity Securities (including options) in violation of the Equity Transfer Procedures shall be null and void *ab initio* as an act in violation of the automatic stay under section 362 of the Bankruptcy Code.

19.  With respect to the Equity Transfer Procedures, the Debtor may waive,

in writing, in its sole and absolute discretion, any and all restrictions, stays and notification

procedures contained in this Motion or in any order entered with respect hereto.

20.  Within five (5) business days after the entry of the interim order, the

Debtor proposes to provide a notice in substantially the form attached as **Exhibit 1** to the interim

order (the "<u>Equity Transfer Procedures Notice</u>") to (a) the Office of the United States Trustee for

the District of Delaware (the "<u>U.S. Trustee</u>"), (b) the United States Securities and Exchange

Commission, (c) the Internal Revenue Service, (d) the Debtor's 30 largest unsecured creditors as

identified in its chapter 11 petition, (e) counsel to the DIP Administrative Agent, DIP Lenders,
Prepetition Indenture Trustee and Secured Noteholders and (f) all known holders of the
outstanding Equity Securities, describing the authorized transfer restrictions and notification
requirements with respect to Equity Securities.

21.     Upon receipt of such Equity Transfer Procedures Notice, any broker,
bank, dealer or other agent or nominee of a beneficial holder (each a "Nominee") of Equity
Securities will be required, within five (5) business days of receipt of such notice and on at least
a quarterly basis thereafter, to send the Equity Transfer Procedures Notice to all beneficial
holders of Equity Securities on whose behalf such Nominee holds Equity Securities.  To the
extent such beneficial holder is also a Nominee, such Nominee must, in turn, promptly provide
the Equity Transfer Procedures Notice to any holder for whose account such holder holds Equity
Securities, and so on down the chain of ownership.  Additionally, any person, entity, broker or
agent acting on behalf of any holder who sells at least (i) 849,916 shares (representing
approximately 4.5% of the 18,887,033 issued and outstanding shares) of the Debtor or (ii) 9,899
shares of Series Z Preferred Stock (representing approximately 4.5% of the 219,994 issued and
outstanding shares) of the Debtor to another person or entity must provide a copy of the Equity
Transfer Procedures Notice to such purchaser or any broker or agent acting on such purchaser's
behalf.

22.     The Equity Transfer Procedures Notice will provide the date and time
(the "Objection Deadline") by which parties must file an objection to the motion ("Objection").
If an Objection is timely filed and served, a final hearing will be held at the date and time set
forth in the interim order (the "Final Hearing").  If no Objection is timely filed and served,
the interim order shall be deemed a final order without further notice or hearing upon expiration

11

of the Objection Deadline.  If a Final Hearing is necessary, the Debtor shall submit to the Court a final order substantially in the form attached hereto as **Exhibit B**.

<u>**Record Date Notice and Summary of Potential Sell-Down Procedures**</u>

23.    At this stage, it is too early to determine whether it will be necessary for the Debtor to seek entry of a Sell-Down Order.  The Debtor's determination of whether to seek entry of a Sell-Down Order will most likely occur once the Debtor has determined whether it may qualify for and benefit from the Section 382(l)(5) Safe Harbor such that it is necessary to require Substantial Claimholders to comply with the Sell-Down Procedures summarized below. Accordingly, this Motion does not seek entry of a Sell-Down Order, but seeks to establish the Record Date through entry of the interim and final orders.  The Debtor proposes to set the Record Date as the date of entry of the interim order.

24.    Following entry of the interim order, the Debtor proposes to provide a notice of the Record Date in substantially the form attached as **Exhibit 5** to the interim order (the "<u>Record Date Notice</u>") to (a) the U.S. Trustee, (b) the United States Securities and Exchange Commission, (c) the Internal Revenue Service, (d) the Debtor's thirty (30) largest unsecured creditors as identified in its chapter 11 petition, (e)  counsel  to the DIP Administrative Agent, DIP Lenders, Prepetition Indenture Trustee and Secured Noteholders (as each is defined in the First Day Declaration), (f) all known holders of the outstanding Equity Securities, (g) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (h) all parties entitled to notice pursuant to Local Rule 9013-1(m).

25.    Upon receipt of such Record Date Notice, any Nominee will be required, within five (5) days of receipt of such notice and on at least a quarterly basis thereafter, to send the Record Date Notice to all beneficial holders of the Debtor's Notes on whose behalf such

Nominee holds the Debtor's Notes.  To the extent such beneficial holder is also a Nominee, such Nominee must, in turn, promptly provide the Record Date Notice to any holder for whose account such holder holds the Debtor's Notes, and so on down the chain of ownership.

26.     Like the Equity Transfer Procedures Notice, the Record Date Notice will also provide the Objection Deadline for parties to file an Objection to the motion, and explain that if no Objection is timely filed and served, the interim order shall be deemed a final order without further notice or hearing upon expiration of the Objection Deadline.  If an Objection is timely filed and served, a Final Hearing will be held and the Debtor shall submit to the Court a final order substantially in the form attached hereto as **Exhibit B.**

27.     In the event the Debtor seeks entry of a Sell-Down Order, the Debtor anticipates that the Sell-Down Procedures would require a person or entity that has acquired an amount of Claims after the Record Date entitling that claimholder to receive more than 4.5% of the equity of the reorganized Debtor (the "Threshold Amount") to provide the Debtor with limited information such as the size of its Claim and the date(s) such Claim was acquired. The amount of Claims held by a claimholder as of the Record Date would constitute the "Protected Amount."  Substantial Claimholders would never be required to sell down their Claims below the Threshold Amount or the Protected Amount, whichever is greater.  In other words, the Sell-Down Order would apply only to persons or entities that acquire Claims in excess of the Threshold Amount after the Record Date and with full notice of the possibility that the Claims they acquire could be subject to sell-down if the Debtor later determines that the Sell-Down Procedures are necessary.

28.     If the Sell-Down Procedures prove to be necessary, the Debtor would seek to require Substantial Claimholders to provide updated holdings information shortly after the

date on which the Court approves a disclosure statement for a plan of reorganization or approves

a qualifying asset sale that proposes to utilize the Section 382(l)(5) Safe Harbor.  Based on the

updated holdings information, the Debtor would then determine whether it would be necessary to

require Substantial Claimholders to sell down a portion of their holdings so that the Debtor may

qualify for the Section 382(l)(5) Safe Harbor and to preserve the value of the Debtor's NOLs.

29.    In the event that the Debtor seeks entry of a Sell-Down Order, the Debtor

would provide adequate notice and opportunity for claimholders to sell down their Claims

without triggering an unreasonably adverse impact on the value of such Claims.  Moreover,

establishment of the Record Date at this early stage of this Chapter 11 Case will provide

claimholders with sufficient notice in advance of any trading opportunity that any Claims

purchased after the Record Date may ultimately be subject to the Sell-Down Procedures as set

forth in a Sell-Down Order.

## Legal Basis for Relief Requested

**A.    The NOLs Are Property of the Debtor's Estate and Are Entitled to Protection.**

30.    Courts have uniformly held that a debtor's NOLs constitute property of

the estate under section 541 of the Bankruptcy Code and, therefore, courts have the authority to

impose measures intended to protect and preserve such NOLs.  The seminal case articulating this

rule is *In re Prudential Lines, Inc.*, 107 B.R. 832 (Bankr. S.D.N.Y. 1989), *aff'd*, 119 B.R. 430

(S.D.N.Y. 1990), *aff'd*, 928 F.2d 565 (2d Cir. 1991); *see also Nisselson v. Drew Indus., Inc.*

*(In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998)

("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the

loss corporation that generated them."); *In re Cumberland Farms, Inc.*, 162 B.R. 62, 67

(Bankr. D. Mass. 1993) (finding that the Second Circuit's *Prudential Lines* ruling on NOLs was

analogous and persuasive in holding that pass-through losses were property of the estate and were protected by the automatic stay); *In re Phar-Mor, Inc.*, 152 B.R. 924, 927 (Bankr. N.D. Ohio 1993) (carryforward NOLs held to be property of the estate and protected by both the automatic stay and an injunction against the sale of stock causing a reduction of the NOLs).

31.     In *Prudential Lines*, the court enjoined a parent corporation from taking a worthless stock deduction with respect to its wholly-owned subsidiary, which was in bankruptcy, on the grounds that allowing the parent to take such a deduction would destroy its debtor subsidiary's NOLs.  In issuing the injunction, the court held that the debtor subsidiary's potential ability to utilize NOLs was property of its estate.  107 B.R. at 838.  Further, the court held that, because of the effect that it would have on the debtor subsidiary's ability to use its NOLs, the taking of a worthless stock deduction by the parent was an exercise of control over the debtor subsidiary's NOLs and thus over property of the debtor subsidiary's estate.  *Id.* at 842. Therefore, such action was properly subject to the automatic stay under section 362 of the Bankruptcy Code.  *Id.* at 843; *see also In re Southeast Banking Corp.*, No. 91-14561, 1994 Bankr. LEXIS 2389, at *2 (Bankr. S.D. Fla. Jul. 21, 1994) (debtor's interest in its NOLs "constitutes property of the estate within the scope of 11 U.S.C. § 541(a)(1) and is entitled to the protection of the automatic stay imposed pursuant to 11 U.S.C. § 362(a)(3)").

32.     Because the Debtor's NOLs are property of its estate, this Court has the authority under section 362 of the Bankruptcy Code to enforce the automatic stay by restricting any Transfer of Equity Securities that could adversely impact the Debtor's ability to use this valuable asset.  Courts ordering such relief generally have done so by imposing notice and objection requirements regarding any proposed transfer of shares on a person whose holdings of such shares exceed (or would exceed as a result of the proposed transfer), a certain threshold

amount.  *See, e.g., In re Molycorp, Inc.*, No. 15-11357 (CSS) (Bankr. D. Del. June 26, 2015) ("Molycorp Interim Order"); *In re RadioShack Corporation*, No. 15-10197 (KJC) (Bankr. D. Del. Feb. 9, 2015) ("RadioShack Order"); *In re Dendreon Corporation*, No. 14-12515 (PJW) (Bankr. D. Del. Nov. 12, 2014; *In re Overseas Shipholding Group, Inc.*, No. 12-20000 (Bankr. D. Del. Dec. 7, 2012) ("Overseas Shipholding Order"); *In re VeraSun Energy Corp.*, No. 08-12606 (Bankr. D. Del. Dec. 3, 2008); *In re NII Holdings, Inc.*, No 14-12611 (SCC) (Bankr. S.D.N.Y. Oct. 22, 2014) ("NII Holdings Order"); *In re Legend Parent, Inc.*, No. 14-10701 (REG) (Bankr. S.D.N.Y. May 9, 2014); *In re Hawker Beechcraft, Inc.*, No. 12-11873 (Bankr. S.D.N.Y. June 27, 2012); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Jan. 27, 2012) ("AMR Order"); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 15, 2012) ("Eastman Kodak Order"); *In re Hostess Brands, Inc.*, No. 12-22052 (RDD) (Bankr. S.D.N.Y. Jan. 27, 2012).

33.    The Equity Transfer Procedures are designed to protect the Debtor from losing the benefit of all or any portion of its NOLs in connection with Transfers of Equity Securities that may (a) trigger an ownership change not within the scope of sections 382(l)(5) or 382(l)(6) of the IRC, (b) preclude the Debtor from taking advantage of the more favorable NOL utilization rules under sections 382(l)(5) or 382(l)(6) of the IRC or (c) severely limit the Debtor's ability to use its NOLs to shelter any taxable income or gain resulting from any sale of assets in the course of this Chapter 11 Case or to reduce federal income taxes on post-reorganization income.  The Debtor requires a mechanism to monitor and possibly object to ownership changes resulting from Transfers of Equity Securities or loss of eligibility for the Section 382(l)(5) Safe Harbor resulting from trading in Claims so it can maintain the ability to pursue a plan of reorganization that permits the Debtor to use its NOLs to the fullest extent possible.

34.     Moreover, it is in the best interests of the Debtor, its estate and its stakeholders to restrict Transfers of Equity Securities that could result in an ownership change and to establish the Record Date with respect to trading in Claims.   Transfers of Equity Securities are limited only for parties who are or might become 4.5% shareholders.   Because Transfers of Equity Securities by or into the hands of 5% shareholders could trigger an ownership change that would impose a severe limitation on the Debtor's use of its NOLs on an annual basis, such Transfers also pose a threat to the value of its NOLs even if the Debtor later satisfied the requirements of sections 382(l)(5) or 382(l)(6) of the IRC.

35.     Additionally, bankruptcy courts in this District and elsewhere have granted relief similar to that requested herein with respect to the establishment of a record date for notice and sell-down procedures for trading in claims.   *See, e.g.*, *In re Molycorp. Inc.*, No. 15-11357 (Bankr. D. Del. June 26, 2015); *In re RS Legacy Corp.*, No. 15-10197 (Bankr. D. Del. February 9, 2015); *In re Overseas Shipholding Group, Inc.*, No. 12-20000 (Bankr. D. Del. November 15, 2012); *In re Borders Grp, Inc.*, No. 11-10614 (Bankr. S.D.N.Y. Mar. 16, 2011); *In re Dana Corp.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y. Aug. 9, 2006) (approving notification and sell-down procedures).   The Debtor submits that the present circumstances warrant similar relief in this Chapter 11 Case.

**B.      The Equity Transfer Procedures and Record Date Notice Are Narrowly Tailored.**

36.     The establishment of the Equity Transfer Procedures will not bar all Transfers of Equity Securities, only those types of Transfers that pose a serious risk to the Debtor's NOLs under the section 382 ownership change test.   Further, the procedures will only be in effect during the pendency of this Chapter 11 Case.   As such, the requested relief is narrowly tailored to allow the Debtor to preserve its ability to seek substantive relief if it appears

that a proposed Transfer will jeopardize the use of its NOLs.  The Equity Transfer Procedures would otherwise permit Transfers of Equity Securities to continue unaffected, subject to applicable law.

37.     As discussed above, the Equity Transfer Procedures are necessary to preserve the value of the Debtor's NOLs.  But those procedures may not be sufficient if, pursuant to a confirmed chapter 11 plan or a qualifying asset sale, (a) creditors receive sufficient equity to trigger an "ownership change" under section 382 of the IRC and (b) the Debtor is unable to utilize the Section 382(l)(5) Safe Harbor.

38.     To avoid that scenario, the Debtor may need to seek the entry of a Sell-Down Order.  In the meantime, the Debtor needs to be able to set and provide notice of the Record Date to give all creditors who may be subject to Sell-Down Procedures advance notice and ensure that the value of the Debtor's NOLs will be preserved.

39.     Approval of the proposed Record Date does not constitute approval of the Sell-Down Procedures and does not restrict trading in Claims.  Importantly, the interim order will not impose a burden on any person or entity since the interim order is designed to provide notice to claimholders and claims traders (a) of the Record Date, (b) that the Threshold Amounts will be measured as of the Record Date and (c) that their Claims may ultimately be subject to sell-down if the Debtor determines that a Sell-Down Order is necessary to preserve the value of its NOLs.  If the Debtor does later determine that a Sell-Down Order is necessary, the Debtor will file a separate motion requesting entry of a Sell-Down Order applicable to certain Claims traded on or after the Record Date.

**C.      Interim Relief Is Necessary to Avoid Irreparable Harm to the Debtor.**

40.      Once an NOL is limited under section 382 of the IRC, its use is limited forever, and once an equity interest is transferred, it cannot be undone.  The relief sought herein is necessary to avoid an irrevocable loss of the Debtor's NOLs and the irreparable harm that could be caused by unfettered Transfers of Equity Securities, which, unmonitored, could jeopardize the Debtor's ability to offset taxable income with its NOLs, thereby risking the Debtor's ability to increase liquidity.

41.      Absent establishing the Record Date at this time, it is unlikely that the Debtor would be able to implement the Sell-Down Procedures in any effective fashion to enable it to maximize the value of its NOLs.  Whether or the Debtor seeks and the Court ultimately enters a Sell-Down Order, setting the Record Date at this time is essential to adequately protect the Debtor's option to choose to preserve the value of its NOLs without affecting any parties in interest.

42.      Accordingly, the Debtor submits that, absent the interim relief granted in the interim order, the Debtor and its estate could suffer immediate and irreparable harm.  If the Court does not grant the relief sought in this motion on an interim basis, holders of Equity Securities could transfer such securities before the protective restrictions herein are implemented by the Court, and the Record Date would not be established for purposes of trading in Claims, risking the Debtor's ability to use its NOLs to maximize value and benefit its estate.  Therefore, the Debtor requests that the procedures described herein be approved immediately on an interim basis.

## **NOTICE**

43.     Notice of this Motion has been given to: (a) the U.S. Trustee, (b) the Securities and Exchange Commission, (c) the Internal Revenue Service, (d) the Debtor's thirty (30) largest unsecured creditors as identified in its chapter 11 petition, (e) counsel  to the DIP Administrative Agent, DIP Lenders, Prepetition Indenture Trustee and Secured Noteholders (as each is defined in the First Day Declaration), (f) all known holders of the outstanding Equity Securities, (g) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (h) all parties entitled to notice pursuant to Local Rule 9013-1(m).  In light of the nature of the relief requested, the Debtor submits that no further notice is necessary.


*[remainder of page left intentionally blank]*

WHEREFORE, the Debtor respectfully requests that the Court enter an order substantially in the form attached hereto as **Exhibit A**: (i) granting the relief sought herein; and (ii) granting to the Debtor such other and further relief as the Court may deem proper.

March 12, 2018
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

/s/     *Jose F. Bibiloni*
Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Jose F. Bibiloni (No. 6261)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@mnat.com
aremming@mnat.com
jbibiloni@mnat.com

- and -

Christopher R. Donoho, III
Christopher R. Bryant
John D. Beck
**HOGAN LOVELLS US LLP**
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
chris.donoho@hoganlovells.com
christopher.bryant@hoganlovells.com
john.beck@hoganlovells.com

*Proposed Counsel for Debtor and Debtor in Possession*