# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| OREXIGEN THERAPEUTICS, INC., | Case No. 18-10518 (KG) |
| Debtor.[1] | **Objections Due: August 21, 2018**<br>**Hearing Date: TBD** |

## McKESSON'S MOTION FOR AN ORDER DETERMINING THAT McKESSON IS ENTITLED TO THE DISPUTED FUNDS

McKesson Corporation ("**McKesson Corp.**" and together with McKesson Patient Relationship Solutions ("**MPRS**"), a business unit of McKesson Specialty Arizona, Inc., a wholly owned subsidiary of McKesson Corp., "**McKesson**"), by and through the undersigned counsel, hereby moves (the "**Motion**") the Bankruptcy Court for entry of an order determining that McKesson has contract rights enforceable under applicable law which expressly provide McKesson Corp. the ability to apply amounts owed by the Debtor to MPRS under one agreement as a credit against obligations owed by McKesson Corp. to the Debtor under another agreement.

The Motion is based on California law, as applicable under and preserved by section 553 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), the facts and arguments set forth in the Motion, the Declaration of Erin Beesley (the "**Beesley Decl.**") filed in support, any additional declarations, papers and pleadings filed in support of the Motion, and on such other and further information as the Bankruptcy Court may deem proper.

## INTRODUCTION

1.      Orexigen Therapeutics, Inc. (the "**Debtor**") was a pharmaceutical drug manufacturer with a single product, Contrave® (the "**Product**").  Ninety percent or more of the Product was sold to three wholesalers and product distributors:  AmerisourceBergen, Cardinal

---

[1] The last four digits of the Debtor's federal tax identification number are 8822.  The Debtor's mailing address for purposes of this Chapter 11 Case is 3344 North Torrey Pines Court, Suite 200, La Jolla, CA 92037.

Healthcare, and McKesson.  In fact, McKesson alone was responsible for the distribution of approximately 40% of the Product to pharmacies in the United States and elsewhere.  As a result of the Debtor's concentrated distribution strategy (which is standard in the pharmaceutical industry), at any particular time, the three wholesalers/distributors were also obligated to the Debtor for approximately 95% of the Debtor's US accounts receivable.

2.      As of March 12, 2018 (the "**Petition Date**"), the Debtor was a party to two separate agreements with McKesson:  the "**Distribution Agreement**"[2] and the "**Master Services Agreement**."[3]  The Distribution Agreement and the Master Services Agreement are referred to collectively as the "**McKesson Agreements**."

3.      Under the Distribution Agreement, McKesson Corp. purchased the Product from the Debtor and McKesson distributed the Product to various pharmacies throughout the United States and McKesson, through its corporate family of companies, provided other services.  Under the Master Services Agreement, MPRS managed the Debtor's LoyaltyScript® program for patients to have access, through retail pharmacies at the point-of-sale, to an array of price discounts for the Product.

---

[2]  The "Core Distribution Agreement" by and between McKesson Corp. and the Debtor was effective as of July 1, 2016, and amended several times.  The Distribution Agreement defined the terms and conditions pursuant to which McKesson Corp. and others within the McKesson corporate family would distribute the Debtor's product and provide certain "core" services.  Beesley Decl. ¶ 3.

[3]  The "Master Services Agreement" by and between MPRS and the Debtor dated as of July 15, 2016, as amended from time to time.  The Master Services Agreement defined the terms and conditions pursuant to which MPRS assisted the Debtor in managing the Debtor's LoyaltyScript® program.  Beesley Decl. ¶ 5.

4.    In the Distribution Agreement, the parties agreed that McKesson Corp. had certain rights to "set-off, recoup and apply amounts" owed between the Debtor and its affiliates on the one hand, and McKesson and its affiliates on the other.  Specifically, the parties agreed:

> "VII.    General
>
>         . . .
>
> i.Notwithstanding anything to the contrary in this Agreement, each of McKesson Corporation and its affiliates is hereby authorized to set-off, recoup and apply any amounts owed by it to Manufacturer's [the Debtor's] affiliates against any all [*sic*] amounts owed by Manufacturer or its affiliates to any of McKesson Corporation or its affiliates, without prior written notice[.]"
>
> Beesley Decl. ¶ 4.

The rights accorded McKesson under that provision are referred to as "**McKesson's Application Rights**."  These rights are fully enforceable under controlling California law.

5.    The Motion's relevant issue arises in the intersection of the business operations under the two McKesson Agreements.  As a result of the integrated distribution-related activities, McKesson Corp. owed the Debtor for Product purchased as of the Petition Date (less certain amounts owed by the Debtor for services provided under the Distribution Agreement) and McKesson and all of its affiliates had the contractual right to apply any payables for product purchases against amounts owed to McKesson and all of its affiliates.  As a result of the management of the Debtor's LoyaltyScript® program, the Debtor in turn owed MPRS for program-related costs that were advanced by MPRS and not reimbursed by the Debtor.  This was the exact circumstance anticipated by both McKesson and the Debtor at the time the Distribution Agreement was entered into and, as a result, express provisions were included in the Distribution Agreement to govern this exact situation.

6.      As of the Petition Date, the Debtor owed MPRS approximately $9.1 million under the Master Services Agreement, and McKesson owed the Debtor approximately $6.9 million under the Distribution Agreement.  In this Motion, McKesson seeks an order authorizing it to exercise McKesson's Application Rights to these obligations.

7.      The resolution of the issues raised in this Motion has nothing to do with the Debtor, the Bankruptcy Code, the terms and conditions under the DIP Loan Facility provided to the Lenders, or the terms of the sale of the Debtor's assets.  Instead, the determining factors relate to the enforceability under applicable California law of certain provisions in the McKesson Agreements (now rejected) which expressly provide McKesson with certain contractual rights—McKesson's Application Rights.  Based on controlling California law, there is no legal or factual basis to limit the application of the express terms of the agreement that grants to McKesson the right to apply the amounts owed.  McKesson anticipates that the Lenders will assert that under section 553 of the Bankruptcy Code, McKesson's Application Rights cannot be asserted, and McKesson acknowledges there is considerable authority supporting the Lenders' assertion.  McKesson responds, however, and posits that the Lenders' argument flies in the face of several fundamental premises of bankruptcy law:  (i) property interests are created and defined by State law; and (ii) to analyze such interests in any other way requires a determination that there exists a substantial federal interest that requires a different result.  Moreover, as explained in more detail below, it would be grossly inequitable to bestow on the Lenders greater rights vis-à-vis McKesson then these Lenders held outside of bankruptcy.

///

///

4

## STATEMENT OF FACTS

8.      The Debtor and McKesson have already addressed a number of the issues

associated with the McKesson Agreements.[4]  As set forth more particularly in the two

stipulations entered into between McKesson and the Debtor (collectively, the "**McKesson**

**Stipulations**") [D.I. 176-1; D.I. 319-1], under the terms of the McKesson Agreements,

McKesson provided product distribution, logistical support and other services for the Debtor.

Beesley Decl. ¶ 8.  As of the Petition Date, the Debtor was in default in its performance

obligations under the McKesson Agreements.  Beesley Decl. ¶ 8.  McKesson incorporates, and

will not repeat, the factual underpinnings of the Court-approved McKesson Stipulations.

The Stipulation Related to the Master Services Agreement.

9.      On April 11, 2018, an order was entered [D.I. 176] that approved the McKesson

Stipulation attached as Exhibit A thereto (the "**April Stipulation**") that addressed, among other

things, the Debtor's obligations under the Master Services Agreement[5] related to the processing

---

[4]  See, *e.g.*, the "Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 361, 363, 503 and 105(a) for Authority to Enter into Stipulation Granting Adequate Protection to McKesson Specialty Arizona, Inc. and its Affiliates" [D.I. 176] and the "Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 361, 363 and 105(a) for Authority to Enter into a Stipulation with McKesson Corporation and McKesson Patient Relationship Solutions, a Business Unit of McKesson Specialty Arizona, Inc."  [D.I. 319].

[5]  The Master Services Agreement was amended several times:  (i) the "First Amendment Master Service Agreement" dated as of October 10, 2016; (ii) the Second Amendment Master Service Agreement" dated as of January 20, 2017; and (iii) the "Third Amendment Master Services Agreement" dated as of October 2, 2017. Beesley Decl. ¶ 5.

The LoyaltyScript® Program is further described in "Schedule A1—Schedule of Services for LoyaltyScript® Program for Contrave®" signed by the Debtor and MPRS and dated on or about July 25, 2016 ("**Schedule A1**").  In turn, Schedule A1 attaches a "Schedule of Fees" (the "**Fee Schedule**").  Beesley Decl. ¶ 7.  The prefatory paragraph of Schedule A1 provides:

> "This Schedule of Services A1 described the Services to be performed by McKesson . . . and [the Debtor] for the LoyaltyScript® Program for Contrave (the "Program").  This Schedule of Services and the attached Schedule of Fees (the "Schedule") are pursuant to the Master Services Agreement . . ." Beesley Decl. ¶ 7.

As a result, both Schedule A1 and the Fee Schedule were entered into pursuant to the Master Services Agreement.

of the Debtor's LoyaltyScript® program for patients to have the benefit of an array of discounts off of the purchase price of the Product through retail pharmacies (the "**LoyaltyScript®**  **Program**").  Beesley Decl. ¶ 5.

10.    As set forth in the April Stipulation, McKesson asserted that it held a prepetition claim against the Debtor in the amount of approximately $9.1 million (the "**McKesson Prepetition Claim**") for MPRS continued payments to patients and pharmacies on account of the Debtor's obligations under the LoyaltyScript® Program before the Petition Date without reimbursement from the Debtor.

11.    In the April Stipulation, the Debtor agreed to make substantial payments to MPRS to fund the "Reimbursement Funds" under the LoyaltyScript® Program, but expressly provided that the payments made shall not be applied to the McKesson Prepetition Claim.  The April Stipulation unambiguously sets forth that "no payments under this Stipulation shall be on account of or applied to the McKesson Prepetition Claim . . ."  [D.I. 176-1, page 6 of 14].

12.    In the April Stipulation, the Debtor agreed to make a "Catch-up Payment" in the form of an "initial payment" of approximately $6.027 million to MPRS for the actual and projected amounts remitted or to be remitted by MPRS under the LoyaltyScript® Program.  The Debtor also agreed to make weekly payments of $1.675 million ($25,000 to be applied to an "Administrative Fee" due under the Master Services Agreement, with the balance to replenish the "Reimbursement Funds" due under that agreement).  McKesson agreed that it would not assert against the Debtor offset rights with respect to weekly payments in excess of the Debtor's post-petition and pre-termination obligations under the LoyaltyScript® Program, but McKesson's

---

Schedule A1 was amended several times:  (i) the "First Amendment to Schedule of Services for LoyaltyScript® Program for Contrave®" dated on or about January 8, 2017; and (ii) the "Second Amendment to Schedule of Services for LoyaltyScript® Program for Contrave®" dated on or about November 16, 2017.  Beesley Decl. ¶ 7.

waiver of post-petition setoff rights related to the April Stipulation is limited to the situation where the Debtor has made "Excess Payments" to McKesson.  [D.I. 176-1, page 7 of 14].

13.      The April Stipulation also provides [D.I. 176-1, page 8 of 14] that upon (a) "entry of an order of the Bankruptcy Court which provides for the rejection of the Program Service Agreement"[6] or (b) "the closing date of a sale of all or substantially all of the Debtor's assets" (each of which, under the April Stipulation, is a "**Termination Event**"), each of the following shall occur "immediately:"  (i) the Master Services Agreement shall terminate; (ii) McKesson shall be relieved of any obligation to perform under the Master Services Agreement; and (iii) McKesson shall no long provide any support function for the LoyaltyScript® Program.

14.      The McKesson Prepetition Claim was based upon MPRS continuing to pay third parties (pharmacies and patients) for discounts and other services that, under the LoyaltyScript® Program were entirely obligations of the Debtor.  MPRS continued the process, knowing that if the reimbursements under the LoyaltyScript® Program were to cease, that would cause confusion and damage to the Product and its patient base.  Indeed, in the April Stipulation, the Debtor acknowledged that it believed and represented that the LoyaltyScript® Program was "critically necessary for the success and viability of the Debtor's business and its ability to preserve and maximize value for creditors."  [D.I. 176-1, page 3 of 14].

The Stipulation Related to the Distribution Agreement.

15.      On May 18, 2018, an order was entered [D.I. 319] that approved the McKesson Stipulation attached as Exhibit A thereto (the "**May Stipulation**") [D.I. 319-1] that specifically addressed, among other things, the obligations arising under the Distribution Agreement. Beesley Decl. ¶ 9.  Under the Distribution Agreement, McKesson was authorized to operate as a

---

[6] The "Program Service Agreement" is another name for the Master Services Agreement.  Beesley Decl. ¶ 6.

distributor of healthcare products (defined in the Distribution Agreement as "the Product(s)") for the Debtor and provide certain core services related thereto. Beesley Decl. ¶ 3.

16.     Under the May Stipulation, McKesson acknowledged that as of the Petition Date, its outstanding payable owed to the Debtor was approximately $6.9 million. [D.I. 319-1, page 3 of 9]. The Debtor acknowledged that after the Petition Date, McKesson paid approximately $3.266 million on account of that payable. McKesson contended that the entire amount of approximately $6.9 million is subject to McKesson's claim of contractual setoff, recoupment, application, and withhold rights. [D.I. 319-1, page 3 of 9]. Further, in accordance with McKesson's Application Rights, McKesson asserted that it has a contractual right, enforceable under applicable California law, to apply the amounts owed to MPRS under the LoyaltyScript® Program. [D.I. 319-1, page 4 of 9].

17.     Under the May Stipulation, subject to a reservation of offset and other rights, McKesson paid the Debtor on account of any prepetition amounts owed under the Distribution Agreement, approximately $3.666 million. Beesley Decl. ¶ 9. As a result of that payment, the Debtor agreed that McKesson has paid in full the entire prepetition amount due under the Distribution Agreement. [D.I. 319-1, page 5 of 9].

18.     The parties agreed in the May Stipulation that: "McKesson may continue to assert its right of setoff on a rolling basis over any monies owed to the Debtor and held by McKesson, including Post-Petition Distribution Agreement Receivables; provided that all parties reserve all rights, claims, counter-claims, objections, defenses, and remedies with respect to the same." [D.I. 319-1, page 5 of 9]. The provision was intended to preserve McKesson's Application Rights. The May Stipulation goes on to provide as follows:

"4.      Upon the occurrence of a Termination Event, or if the MPRS Prepetition Claim is not otherwise satisfied in full, McKesson, MPRS or both of them shall file a motion in the Bankruptcy Court seeking an order authorizing them to set off the MPRS Prepetition Claim against the Debtor's Post-Petition Distribution Agreement Receivables ("**McKesson's Setoff Motion**").  The Debtor reserves all rights, counter-claims, objections, and defenses in connection with McKesson's Setoff Motion.

5.      If McKesson's Setoff Motion is granted and an Order is entered authorizing McKesson to set off the MPRS Prepetition Claim or requiring the Debtor to pay to MPRS all or any portion of the MPRS Prepetition Claim, within four (4) business days after entry of that Order (unless the effect of the Order is stayed pending appeal) then, as applicable:  (a) McKesson may set off the MPRS Prepetition Claim to the extent authorized by the Court against any Post-Petition Distribution Agreement Receivables; (b) to the extent that Post-Petition Distribution Agreement Receivables at the time of the Order granting McKesson's Setoff Motion under the Distribution Agreement are insufficient to allow for the required set off, the Debtor shall pay to MPRS the difference between the amount of setoff approved by the Court and Post-Petition Distribution Agreement Receivables then available for setoff; and (c) if such differential is not paid timely, MPRS shall, to the extent of any unpaid or insufficient amount, be granted a priority administrative claim under Section 503 of the Bankruptcy Code, which claim shall survive the Bankruptcy Case, including the terms of a confirmed plan in this case, and shall be due and payable by the Debtor or reorganized debtor."

[D.I. 319-1, page 6 of 9].  (Emphasis in the original).

19.     The Order approving the May Stipulation provides that "[t]he Stipulation and this Order and the transactions contemplated thereby and hereby shall be without prejudice to (i) any and all rights McKesson and MPRS may have to assert an offset as of the Petition Date of the MPRS Prepetition Claim against the McKesson Prepetition Distribution Agreement Receivable; and (ii) any and all rights the Debtor may have to dispute, object, and assert claims, counter-claims, defenses, and remedies with respect to any offset assertion raised by McKesson and

MPRS."  D.I. 319, page 2 of 2.  This Motion is "McKesson's Setoff Motion" referenced in the

Order approving the May Stipulation, and seeks to enforce McKesson's Application Rights.

20.    The Debtor recently obtained approval of a motion to sell substantially all of its

assets, including substantially all rights associated with the Product, to a newly-formed entity

(the "**Buyer**").  The sale transaction closed on July 27, 2018.  [D.I. 640].  Under the asset

purchase agreement, the Buyer purchased all accounts receivable, including any amounts owed

by McKesson.  [D.I. 231-4, page 64 of 433].  Under the terms of an amendment to the asset

purchase agreement, the cash amount of the consideration for substantially all of the Debtor's

assets is $73.5 million.  [D.I. 633-1].  The entirety of the proceeds of sale of the Debtor's assets

are subject to the security interest of and allocated to the Lenders, except only a relatively small

negotiated "carve-out" available for distribution to administrative and unsecured creditors.

Details of the "carve-out" were announced during the sale approval hearing (held on June 28,

2018).  *See* June 28, 2018 Transcript.  [D.I. 474].

21.    In order to protect McKesson's property interest in the Disputed Funds, *i.e.*,

McKesson's Application Rights, the parties entered into a stipulation approved by a court order

[D.I. 592].  Under that stipulation, the Debtor segregated $6,932,816.40, the amount of the

Disputed Funds, and is holding those funds for the parties' benefit pending resolution of

McKesson's Disputed Rights under the Motion.  To the extent this Court denies McKesson's

Motion, and that order becomes final, then the Disputed Funds, "as cash collateral of the

Lenders" will be paid to the Debtor, subject to the Lender's security interest.  [D.I. 592-1, page 6

of 9].  In the near term, the Debtor is expected to file a plan of liquidation consistent with these

terms.

22.     Thus, while the Debtor is ostensibly a party to the Motion, in truth it is merely a stakeholder for a group of lenders (collectively the "**Lenders**") who would reap any benefit from denial of enforceability of McKesson's Application Rights.  In addition to holding substantially all of the secured debt of the Debtor, certain of the Lenders are hold approximately 90% of the equity interest in the Buyer and as to the holder of the remaining 10%, McKesson understands certain of the Lenders are creditors holding security interests in that entity's assets.

## LEGAL ARGUMENT

### The Enforceability of McKesson's Application Rights are Governed by California Law.

23.     Section VII.b. of the Distribution Agreement provides that "[t]his Agreement will be governed by and construed in accordance with the laws of California, without regard to or application of conflict of law, rules or principles."  Said differently, if any party seeks to assert that under applicable nonbankruptcy law, the express language describing McKesson's Application Rights in the Distribution Agreement is anything other than fully enforceable in accordance with its terms, such assertion must be grounded in California law.  As to the impact of bankruptcy law, the analysis begins with *Butner*.

24.     As determined by *Butner v. United States*, 440 U.S. 48, 55 (1979):

> "Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.  Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' [Citation deleted].  The justifications for application of state law are not limited to ownership interests; they may apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property."

25.     Unless, as said in *Butner*, ". . . some federal interest requires a different result,"
California law applies to construe the Distribution Agreement and define the rights and
obligations of the parties, including the enforceability of McKesson's Application Rights.  While
section 553 of the Bankruptcy Code imposes certain defined restrictions in order to fit into the
context of a bankruptcy, a non-debtor party's contractual rights are preserved under the
Bankruptcy Code, McKesson asserts that there is no federal interest that would impose a federal
gloss on the application of state law to these rights.  Recognizing that there are a large number of
cases to the contrary (which do not address the Supreme Court's clear guidance in *Butner* and
similarly-decided cases), McKesson maintains that the correct reading of section 553 is to
conclude that the section does not create any federal right of setoff and that it does not interfere
with McKesson's rights under California law and the enforceability of McKesson's Application
Rights.  *See generally Butner*, 440 U.S. at 54 n.9 (creditor's rights under state law may be
suspended only in the event of an "actual conflict with the system provided by [the Bankruptcy
Code]").

26.     It should also be noted the McKesson Agreements involve only a parent and a
wholly-owned subsidiary, each of which undertakes to support another entity (in this case, the
Debtor) by providing completely integrated services (*i.e.*, distribution of Product as compared
with management and logistical support for the Debtor's LoyaltyScript® Program).  In light of
current business structures, one can posit that in that context, if any federal interests are affected,
recognition of McKesson's Application Rights better serves the federal interest in this context of
patient care and safety.

27.     Finally, McKesson's Application Rights do not relate exclusively to common law
offset.  Far from it.  In fact, the provision grants to McKesson at least three separate rights,

claims or defenses.  The language of the Distribution Agreement grants to McKesson authority

". . . to set-off, recoup and apply any amounts owed . . ."  Under the Distribution Agreement,

McKesson has the authority (i) to set-off, (ii) to recoup, and (iii) to apply any amounts owed.

These contract rights are not synonymous.  As the Court is well aware, the right to set-off is

different from the right to recoup, and different from generalized contract authority to apply

amounts owed.

      28.     As a result, without a clearly articulated federal interest that would be

substantially and negatively impaired by recognition of McKesson's Application Rights, the

Court should rely upon California law and allow those rights to be enforced.

      **State Law Governs Mutuality and California Law Permits Express Agreements to
Confirm the Nature of Parents and Subsidiaries.**

      29.     Because state law governs the right to setoff, and are preserved under section 553,

controlling state law should be relied upon as to the conditions for setoff.  "Mutuality of

obligations is determined by state law."  *In re Garden Ridge Corp.*, 338 B.R. 627, 633 (Bankr.

D. Del. 2006) (applying Texas law) (quoting *In re Czyzk*, 297 B.R. 406, 409 (Bankr. D.N.J.

2003)); *In re Sunset Aviation, Inc.*, 468 B.R. 641, 647 (Bankr. D. Del. 2011) ("the right of setoff

requires mutuality between the debtor and the creditor *under the applicable state law*")

(emphasis added); *In re Bill Heard Enters., Inc.*, 438 B.R. 745, 750 (Bankr. N.D. Ala. 2010)

("state law must be examined to determine whether mutuality exists"); *Levine v. Kenny (In re

Flooring American, Inc.)*, 302 B.R. 403, 406 (Bankr. N.D. Ga. 2003) ("Whether mutuality exists

is an issue of state law.") (applying Georgia law); *County of Orange v. County of Orange*, 183

B.R. 609, 615 (Bankr. C.D. Cal. 1995) ("Mutuality is generally an issue of state law."); *see

generally In re Calore Exp. Co., Inc.*, 288 F. 3d 22, 43 (1st Cir. 2002) ("Setoff is a creature of the

common law, and therefore in most cases a question of state law"); *In re MCB Fin. Grp., Inc.*,

No. 10-11176-WHD, 2011 WL 8609454, at *4 (Bankr. N.D. Ga. Mar. 31, 2011) ("application of section 553 to preserve a right of setoff presupposes the existence of a valid, prepetition right of setoff, the source of *which must be applicable nonbankruptcy law*.") (emphasis added).[7]

30.    In the context of offset and similar transactions, courts look to section 553 of the Bankruptcy Code for guidance.  Section 553 in pertinent part provides:

> [e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, **this title does not affect** any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . 11 U.S.C. § 553(a). (emphasis added).

31.    Section 553 does not create a right of setoff, but merely preserves the right of setoff available under applicable state law.  The Supreme Court in *Citizen's Bank v. Strumpf*, 516 U.S. 16 (1995) said "[a]lthough no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.  Here it is undisputed that, prior to the bankruptcy filing, petitioner had the right under Maryland law to set off  . . ."  516 U.S. at 18-19.  The Supreme Court also referenced section "553(a)'s general rule that the Bankruptcy Code does not affect the right of setoff . . ."  516 U.S. at 19.  *See also In re Garden Ridge Corp*., 338 B.R. 627, 632 (Bankr. D. Del. 2006).  Instead of creating a right of setoff, section 553 preserves for a creditor's benefit any setoff right that it may have under applicable nonbankruptcy law.  *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Bankr. D. Del. 2009) (hereinafter, "*Semcrude*").

32.    As the Third Circuit has recognized, "[s]etoff rights arise under the common law of equity.  *In re Garden Ridge Corp.,* 386 F. App'x 41, 43 (3d Cir. 2010).  Notably, the Third

---

[7] As the Bankruptcy Code does not define the term "mutuality," state law governs the meaning of that term. *See, e.g., Kaufman v. Chalk & Vermilion Fine Arts, LLC,* 31 F. App'x 206 , 208 (2d Cir. 2002) (noting that "[b]ecause the Bankruptcy Code does not define 'interests in property,' state law controls").

Circuit cited page 409 of the *Czyzk* decision in support of the Third Circuit's statement that setoff

rights arise under the common law.  *Id.*  (citing *Czyzk,* 297 B.R. at 409).  On page 409, the *Czyk*

court held that "[m]utuality of obligations is determined by state law."

33.    Here, the Distribution Agreement is governed by California law, and therefore,

this Court must first look to the California Supreme Court to determine setoff rights, including

mutuality.  The State Supreme Court has articulated that if there is an express mutual agreement,

then a corporate subsidiary can "be deemed a mutual debtor-creditor of the parent."  *Prudential*

*Reinsurance Co. v. Superior Court*, 3 Cal. 4th 1118, 1137 (Cal. 1992).

34.    The Distribution Agreement contains the requisite mutual agreement under

*Prudential Reinsurance* such that McKesson Corporation and all of its corporate subsidiaries,

including MPRS, are to be considered mutual so as to allow McKesson to "set-off, recoup, and

apply any amounts owed."  [Distribution Agreement at section VII.i].  The Distribution

Agreement expressly references the parties at issue here – the wholly owned subsidiary of

McKesson.  The McKesson Application Rights do not involve any entity outside of the close

family of entities that comprises the McKesson business enterprise and contemplates the modern

reality of corporate structures where a corporation could bring all activities within a single

corporate entity but for a variety of tax, liability, and historical considerations utilizes wholly

owned subsidiaries for a variety of undertakings, especially in the context of the integrated

services provided by the closely-related McKesson entities.

35.    Enforcing the McKesson entities' setoff rights under California is consistent with

the holding of then Circuit Court Judge Stephen Breyer (now Justice Breyer) that *state* law,

rather than *federal* law, governs setoff rights.

> The threshold question is whether the Bank's setoff rights are to be
> determined by state or federal law. The parties and the courts

> below had proceeded on the assumption that Massachusetts law
> governs, but the Bank now raises the possibility that § 68 of the
> former Bankruptcy Act imposes a federal standard. Assuming that
> the question may be presented for the first time on appeal, *compare
> Dobb v. Baker*, 505 F.2d 1041, 1044 (1st Cir. 1974), with *Johnston
> v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir. 1979), we believe
> that the bankruptcy court and district court properly looked to the
> law of Massachusetts.  We are aware of no case holding that
> federal rather than state law governs pre-petition setoffs.

*In re Saugus Gen. Hosp., Inc.*, 698 F.2d 42, 44 (1st Cir. 1983); *see also In re Garden Ridge Corp.,* 386 F. App'x 41, 43 (3d Cir. 2010) ("Setoff rights arise under the common law of equity.").

36.     Then Circuit Judge Breyer also specifically recognized that parties are free to modify by contract state common law setoff right.  Specifically Judge Breyer declared as follows:  "The Bank's setoff rights are governed by Massachusetts' basic common-law setoff doctrines.  While the parties are free to modify these common-law setoff rules by contract, they have not done so here."  *Id.* at 44-45.

37.     In *Saugus General Hospital,* Judge Breyer was addressing section 68 of the former Bankruptcy Act of 1898.  That provision also required "mutuality" of debts.  *See* 11 U.S.C. § 68a (repealed 1978) ("in all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.").  The Supreme Court long ago interpreted section 68a as recognizing common law setoff, not creating a right of federal set off.  *See Cumberland Glass Mfg. Co. v. De Witt*, 237 U.S. 447, 455 (1915) ("This statute recognizes the nature of set-off, as established in common law and equitable procedure.").

38.     When Congress enacted section 553, it did not evidence any intent to change the law regarding the source of setoff rights.  Indeed, the language of section 553 disproves any such

intent.  *See* 11 U.S.C. § 553(a) ("this title does not affect any right of a creditor to offset a mutual

debt owing by such creditor to the debtor that arose before the commencement of the case.").

Accordingly, the interpretation of section 68a is instructive when interpreting section 553 of the

Bankruptcy Code.  *See Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("When Congress amends

the bankruptcy laws, it does not write 'on a clean slate.'  Furthermore, this Court has been

reluctant to accept arguments that would interpret the Code, however vague the particular

language under consideration might be, to effect a major change in pre-Code practice that is not

the subject of at least some discussion in the legislative history."); *Pennsylvania Dept. of Public*

*Welfare v. Davenport*, 495 U.S. 522, 563 (1990) ("We will not read the Bankruptcy Code to

erode past bankruptcy practice absent a clear indication that Congress intended such a

departure."); *Kelly v. Robinson*, 479 U.S. 36, 44 and 46 (1986) (declaring that established pre-

Code practice "informs our understanding of the language of the Code"); *Midlantic Nat'l Bank v.*

*NJ Dept. of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is

that if Congress intends for legislation to change the interpretation of a judicially created

concept, it makes that intent specific.  The Court has followed this rule with particular care in

construing the scope of bankruptcy codifications.").

39.     Here, the parties have reaffirmed governing California common law by

contractually providing that the related McKesson entities should be treated as a single

counterparty for purposes of setting off their claims against the Debtor and the Debtor's debts to

the McKesson entities, all of which relate to an integrated product distribution and customer

loyalty program.

40.     Moreover, this result is consistent with California decisions finding a connection

between parents and subsidiaries.  *See*, *e.g. Dorel Industries, Inc. v. Superior Court*, 134 Cal.

App. 4th 1267, 1275-76 (Cal. Ct. App. 2005) (finding parent subject to general jurisdiction in California through subsidiary). California courts have found a tight connection between parent and subsidiary in many different situations, including common scenarios such as for purposes of jurisdiction, *see id*., or to attach liability, *Las Palmas Assoc. v. Las Palmas Center Assoc.*, 235 Cal. App. 3d 1220, 1248-48 (Cal. Ct. App. 1991) (finding sister company liable for fraud of affiliate). The relationship of a parent and subsidiary can also create disqualifying conflicts of interest for California attorneys who do work for both parent and subsidiary. *Morrison Knudsen Corp. v. Hancock*, 69 Cal. App. 4th 223, 252-53 (Cal. Ct. App. 1999) (disqualifying an attorney because of the "close relationship" between corporate affiliates).

### Section 553's Restrictions on Setoff Should be Limited to Those Integrating Setoff into the Context of Avoidance Actions.

41. McKesson acknowledges, of course, that section 553(a) imposes material restrictions on a non-debtor party's state law rights. For the most part, those restrictions relate to integrating setoff rights into the context of possible avoidance actions related to setoffs effectuated prepetition.[8] Such integration effectively limits common law offset as a way of avoiding otherwise avoidable prepetition transfers. *See, e.g., In re Elcona Homes Corp*., 863 F. 2d 483, 487 (7th Cir. 1988) (buying a debt in order to claim offset rights ". . . is plainly evasive and easily rebuffed. Indeed, it will normally violate 11 USC § 553(a)(3) which was added in 1978 to close a loophole that had allowed preferences in the form of set offs, and which forbids a set off where the debt was incurred within 90 days before bankruptcy, while the debtor was insolvent, and for the purposes of obtaining a set off against him.") The court in *In re Brook Farms*, 70 B.R. 368 (Bankr. E. D. Wisc. 1987), noted "[t]he enactment of § 553 was an expression of the Congressional intent sanctioning the exercise of setoff as a permissible

---

[8] It is not a coincidence that section 553 is in the Bankruptcy Code with section 547 (Preferences) and section 548 (Fraudulent Transfers).

preference under certain circumstances." 70 B.R. at 372-73. Some courts have expanded the additional restrictions on a creditor seeking setoff and at times, McKesson posits that an overly expansive view of the prepetition restrictions on setoff under section 553 flies in the face of both applicable State law and the economic realities in today's increasingly complex business environment (particularly where, as here, a creditor did not effectuate a prepetition setoff).

42.    The impact of section 553 has been construed to impose restrictions to offset that would, outside of a bankruptcy setting be perfectly enforceable. Those conditions have been described as "well settled" (See, *e.g.*, *SemCrude* at 393) and McKesson acknowledges that there are a large number of decisions that impose such limits. For example, a number of courts have read section 553(a) to require that "[i]n order to effect a setoff in bankruptcy, courts construing the Code have long held that the debts to be offset must be mutual, prepetition debts." *Semcrude* at 393. *See, e.g.*, *Semcrude* at 393-94 ("Because of the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy. Moreover, because each corporation is a separate entity from its sister corporations absent a piercing of the corporate veil, a subsidiary's debt may not be set off against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances. Allowing a creditor to offset a debt it owes to one corporation against funds owed to it by another corporation—even a wholly-owned subsidiary—would thus constitute an improper triangular setoff under the Code."); *In re Lehman Brothers Inc.*, 458 B.R. 134, 139 (Bankr. S.D.N.Y. 2011) ("Contrary to the assertion by UBS that section 553 of the Bankruptcy Code 'is derived from, and preserves, common-law setoff rights, . . . the text of section 553 is not limited to common-law setoff and by its plain wording applies whenever a creditor seeks to exercise *any* purported setoff right—including one created by contract—in a case under the Bankruptcy Code."); *Sass v.*

*Barclays Bank PLC* (*In re Am. Home Mortgage, Inc.*), 501 B.R. 44, 57 (Bank. D. Del., 2013) (concurring "entirely with Judge Shannon's decision [*Semcrude*]".)  McKesson is confident that the Lenders will refer to similar decisions.

43.     That said, McKesson asserts that the correct reading of section 553—under controlling Supreme Court precedent—does not lend itself to impose such requirements on what would otherwise be a perfectly enforceable contract right, especially if they are not related to setoff in the context of prepetition avoidance actions.  In fact, substantially all of the language of section 553 is on exactly that point:  to incorporate avoidance concepts and make those concepts applicable to common law setoffs.

## **MPRS's Status as a Third Party Beneficiary Satisfies any Mutuality Requirement.**

44.     There is no dispute that MPRS is a third party beneficiary of the Distribution Agreement.  Here, both McKesson Corp. and the Debtor intended that MPRS benefit from the provisions of the Distribution Agreement and, in particular, the provision that McKesson could apply amounts due to the Debtor against the amounts owed to MPRS.  Under California law, a third party qualifies as a beneficiary and a non-named party under a contract where the contracting parties must have intended to benefit that individual and such intent appears from the terms of the agreement.  *Brinton v. Bankers Pension Servs., Inc.* (1999) 76 Cal. App. 4th 550, 558; see also Cal. Civ. Code § 1559.  And, under California law, in order to be entitled to third party beneficiary status, there is no requirement that that the person be named in the contract. *Harper v. Wausau Ins. Corp.* (1997) 56 Cal. App. 4th 1079, 1086.

45.     As the third party beneficiary of the Distribution Agreement, MPRS is a party to that agreement and may sue for damages under that agreement.  This precise point has been

//

recognized by the Judicial Council of California in its adoption the California Civil Jury

Instructions (the "**CACI**").  As set forth in the CACI:

> [*Name of plaintiff*] is not a party to the contract. However, [*name of plaintiff*] may be entitled to damages for breach of contract if [*he/she/it*] proves that [*insert names of the contracting parties*] intended for [*name of plaintiff*] to benefit from their contract.
>
> **It is not necessary for [*name of plaintiff*] to have been named in the contract.**  In deciding what [*insert names of the contracting parties*] intended, you should consider the entire contract and the circumstances under which it was made.[9] (emphasis added).

46.    Thus, as a legally recognized party to the Distribution Agreement, MPRS stands

in a direct counter-contractual relationship with the Debtor on both contracts—the Distribution

Agreement and the Master Services Agreement.  This satisfies any mutuality requirement for

effectuating setoff or application of funds.  *See e.g. In re Bacigalupi, Inc.*, 60 B.R. 442, 446 (9th

Cir. BAP 1986) (applying California law, the Ninth Circuit Bankruptcy Appellate Panel stated

that a setoff claim 'cannot fail for lack of mutuality' where complaint in other acts alleges third-

party beneficiary status); *see also Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 194 F. Supp.

2d 378, 394-95 (D.N.J. 2002) (Exxon, as a third party beneficiary to a contract, can assert a

setoff defense and the setoff defense does not fail for lack of mutuality).

> **Even if the Court were to Determine that Bankruptcy Law Controls the Enforceability of McKesson's Application Rights, the Bankruptcy Court Should Determine those Rights to be Fully Enforceable in Full Accordance with their Terms.**

47.    The Distribution Agreement is to be "governed and construed in accordance with

the laws of the State of California, without regard to or application of conflict of law, rules or

principles."  Distribution Agreement, section VII.a.

---

[9] The CACI is the product of a California Supreme Court-created panel, whose charge is to write instructions that are legally accurate and understandable to the average juror.  The current-version of the CACI is available on-line at the following address:  http://www.courts.ca.gov/partners/documents/caci_2018_edition.pdf .  The California Model Jury Instruction for third-party beneficiary is attached hereto as <u>Exhibit A</u>.

48.     But a review of the language of section VII.i, the basis for McKesson's Application Rights, demonstrates that the parties intended not just common law offset, but to allow each of the following remedies as each may be applicable:  (i) offset, (ii) recoupment, and (iii) contractual application to claims owed by any of the McKesson affiliates against any obligations owed by the Debtor.  It is noteworthy that the Debtor expressly authorized each of McKesson's Application Rights two years before the Petition Date.  In other words, under the controlling agreement, the parties agreed that each McKesson entity that is a creditor of the Debtor may apply a credit against that obligation in order to "balance the books," so to speak.  At this late date, if the Debtor or the Lenders assert that the provisions forming the basis of McKesson's Application Rights were not an important and material element of the agreement, such an assertion cannot be made with a straight face.

49.     McKesson anticipates that the Lenders will claim that McKesson is seeking to rely upon common-law offset to assert what has been described as a "triangular" (and therefore non-mutual) set off.   Both Delaware law and California law recognize the right of setoff between two parties for mutual debts.  *See* 10 Del. C. § 8120; California Code of Civil Procedure § 431.70.  And in the Distribution Agreement, effective as of July 1, 2016 (more than two years ago), McKesson's Application Rights were expressly reserved.  As McKesson's Application Rights include, but are not limited to, common law offset, this Motion does not rely merely upon common law offset rights.  Instead, McKesson asserts that under California law, the right of contracting parties to provide for application of credits as described in McKesson's Application Rights should be respected and control.

50.     The cases that criticize provisions that purport to assert a "triangular" setoff among a debtor, a creditor and an affiliate (such as *SemCrude*) and those cases relying upon

earlier decisions without meaningful analysis, are not controlling. Those cases are governed not by state law, but by section 553(a) of the Bankruptcy Code, and rely upon a finding that the proposed offset does not meet the mutuality requirements of that section.

51.     But that line of cases is not controlling for at least two reasons. First, in a number of instances, those cases dealt with a debtor and its affiliate, not a corporate creditor and its corporate affiliate. And since there was no finding that the debtor and its affiliate were substantively consolidated or alter egos,[10] the Court could rely upon section 553(a) of the Bankruptcy Code. Of course, the determinative facts applicable to the Motion do not include a debtor and its affiliate, but instead, a creditor and its corporate affiliate. The second reason is that as set forth above, under controlling California law, a setoff involving a parent and a subsidiary is enforceable.

52.     It is also noteworthy that in *In re Garden Ridge Corp.*, 338 B.R. at 634, the bankruptcy court noted an agreement that includes an express provision to allow a "triangular" setoff between related entities can create the mutuality required for setoff. Under exactly those circumstances, the parties in the instant case intended that the obligations owed by the Debtor to a McKesson affiliate would be available to apply against the obligations of another McKesson affiliate to the Debtor.

**Under Section 9404 of the California Commercial Code, All of the Lenders' Rights In the Debtor's McKesson-Related Accounts Receivable Are Subject to McKesson's Contractual Defenses**.

53.     McKesson's Application Rights are expressly preserved by section 9404 of the California Commercial Code. The statute provides that:

---

[10] The record reflects that in *Semcrude*, the debtors' cases were consolidated for procedural purposes only. 399 B.R. at 390.

[T]he rights of an assignee are subject to both of the following:

(1) All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract.

(2) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee."

*See* Cal. Com. Code  § 9404(a).[11]

54.     Thus, a party assigned or otherwise taking a security interest in the Debtor's asset takes that security interest subject to all of McKesson's contractual rights and defenses, including claims enforceable as McKesson's Application Rights .  *See In re US Aeroteam, Inc.*, 327 B.R. 852, 870-71 (Bankr. S.D. Ohio 2005) (finding a bank takes a security interest subject to a pre-existing right to set-off).  Bankruptcy courts have not hesitated to apply section 9404 (and its old Article 9 predecessor, § 9-318) when analyzing contract rights similar to rights of offset.  *See In re Calore Express Co., Inc.*, 288 F. 3d 22, 45-47 (1st Cir. 2002) (determining relative rights in collateral well after the bankruptcy sale of those assets by applying UCC Article 9).

55.     The California Commercial Code lays out only three exceptions to application of section 9404, none of which apply here:  (1) the statute does not apply to health care receivables; (2) any claim of offset can only reduce the amount owed; and (3) the claims of offset cannot have been waived.  *See* Cal. Com. Code § 9404.  First, the asset in question is not a health care receivable and this exception does not apply.  *See* Cal. Com. Code § 9404(e).  Second, McKesson's Application Rights are only being asserted to apply the debt owed by the Debtor to satisfy the debt owed by McKesson, satisfying the requirement of section  9404(b).

---

[11]  As discussed, California law governs the Distribution Agreement, and any dispute regarding various obligations, and defenses to those obligations, would be interpreted under California law.

56.     And since McKesson has gone to extraordinary lengths to insure that it never waived McKesson's Application Rights, any rights under the Distribution Agreement or any claims of offset, the third exception is likewise inapplicable.  On the contrary, in the May Stipulation and various pleadings, McKesson has already raised McKesson's Application Rights, and other issues of contractually and statutorily preserved offset rights, including before the Court.  At the June 28 hearing, McKesson argued to this Court that "McKesson would have, and still has, it's [sic] 9404 rights." (Transcript at 97:20-21).

57.     Consequently, McKesson's Application Rights and other contractual rights under the Distribution Agreement are protected by section 9-404 of the California Commercial Code. McKesson's Application Rights continue against third parties granted new security interests or otherwise assigned assets against which McKesson is entitled to apply its defenses.

58.     It should also be noted that this result should come as no surprise to the Lenders. Since 90% or more of the Debtor's US accounts receivable are related to the three principal national drug wholesalers, the Lenders would have had very little difficulty asking McKesson and the other wholesalers to waive their rights under section 9-404 of the Uniform Commercial Code.  The Lenders chose not to request a waiver, and instead made their credit decisions with the understanding that the overwhelming volume of the Debtor's US accounts payable were subject to the three wholesalers' defenses and counterclaims described in section 9-404.

59.     As of the Petition Date, McKesson owed the Debtor $6,932,816.40.  Also as of the Petition Date, the Debtor owed MPRS approximately $8.5 million under the Master Services Agreement.  Had this bankruptcy case not filed, McKesson would have been entitled to apply one debt to reduce the other obligation, as expressly agreed to between the parties, and as fully in accord with McKesson's Application Rights.  The Lenders, with full knowledge of McKesson's

business dealings with the Debtor and McKesson's position as the Debtor's largest customer and account payor, opted to forego seeking to have McKesson waive its UCC Section 9-404 rights and defenses, and its Application Rights.  Having made that lending decision, it would be grossly inequitable to allow the Lenders to use the Debtor's bankruptcy case as sword against McKesson.  Stated another way, as between McKesson and the Lenders, the equities weigh heavily in favor of McKesson.

## NOTICE

60.     Notice has been provided to the Debtor, the United States Trustee, and parties who have filed a notice of appearance in this case.  McKesson submits that in light of the nature of the relief requested, no further notice need be provided.

## NO PRIOR REQUEST

61.     McKesson has not made a prior request for the relief requested in this Motion in this or any other court.

## CONCLUSION

Based on the foregoing, McKesson respectfully requests the Court grant the Motion and enter an order substantially in the form attached hereto as <u>Exhibit B</u>:  (i) authorizing McKesson to apply the obligations the Debtor owes MPRS under the Master Services Agreement against the obligations McKesson owes to the Debtor under the Distribution Agreement.; (ii) directing the Debtor to make payment in accordance with paragraph 5 of the May Stipulation; and (iii) such other and further relief as the Court may deem just and proper.  The Lenders are not entitled to a windfall at the expense of McKesson, particularly when that windfall would not be available to the Lenders outside of bankruptcy.

Dated: July 30, 2018
      Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By:   */s/ Kurt F. Gwynne*
      Kurt F. Gwynne (No. 3951)
      1201 Market Street, Suite 1500
      Wilmington, Delaware 19801
      Telephone: (302) 778-7500
      Facsimile: (302) 778-7575
      E-mail:  kgwynne@reedsmith.com

      and

Jeffrey K. Garfinkle (admitted *pro hac vice*)
Daniel H. Slate (admitted *pro hac vice*)
Buchalter, A Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514
Telephone: (949) 760-1121
E-mail:  jgarfinkle@buchalter.com
         dslate@buchalter.com

*Counsel for McKesson Corporation and McKesson Patient Relationship Solutions, a business unit of McKesson Specialty Arizona, Inc.*